E-FILED
Tuesday, 27 May, 2008 01:55:10 PM
Clerk, U.S. District Court, ILCD

**In the United States District Court**
**For the Central District of Illinois**
**Urbana Division**

| | |
|---|---|
| Western World Insurance Group, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. 08-2118 |
| v. | ) |
| | ) |
| Selective Insurance Company of | ) |
| South Carolina and Monticello Insurance | ) |
| Company, n/k/a Allianz Global Risk, U.S., | ) |
| | ) |
| Defendants. | ) |

FILED

MAY 2 7 2008

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

### Complaint for Declaratory Judgment

Now comes the Plaintiff, Western World Insurance Group, by and through its attorneys, Glenn F. Fencl and Richard R. Gordon of Johnson & Bell, Ltd., and for its Complaint for Declaratory Judgment against the Defendants, Selective Insurance Company of South Carolina and Monticello Insurance Company, n/k/a Allianz Global Risk, U.S., pursuant to 28 U.S.C. § 2201, states as follows:

### Jurisdiction and Venue

1.      This is an action for declaratory judgment brought pursuant to 28 U.S.C. § 2201.

2.      Western World Insurance Group (hereinafter "Western World") is an insurance company, duly organized under the laws of the State of New Hampshire, with its principal place of business in Franklin Lakes, New Jersey.  Western World is authorized to do business in the State of Illinois.

3.      Selective Insurance Company of South Carolina (hereinafter "Selective") is an insurance company, duly organized under the laws of the State of South Carolina, with its

principal place of business in the State of North Carolina. Selective is authorized to do business in the State of Illinois.

4.     Monticello Insurance Company, n/k/a Allianz Global Risk, U.S. (hereinafter "Monticello"), is an insurance company, duly organized under the laws of the State of Delaware, with its principal place of business in California. Monticello is authorized to do business in the State of Illinois.

5.     The amount in controversy herein exceeds $75,000.00.

6.     Jurisdiction in this Court is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because all parties herein conduct business in the State of Illinois, and a substantial part of the events or omissions giving rise to this claim occurred in the Central District of Illinois.

**The Underlying Facts**

8.     On July 6, 1986, Dyke and Karen Rhoads (hereinafter "the Rhoads") were murdered in their home in Paris, Illinois.

9.     Detective James Parrish (hereinafter "Parrish") and Chief Gene Ray (hereinafter "Ray") of the City of Paris Police Department (hereinafter "the City of Paris") immediately opened an investigation into the Rhoads murders.

10.     Parrish and Ray arrested Gordon Randall Steidl ("Steidl") and Herbert Whitlock ("Whitlock") for the Rhoads' murders.

11.     Steidl and Whitlock were subsequently tried, convicted and sentenced to death for the Rhoads' murders.

12.     On December 5, 2007, Steidl filed an eleven-count Complaint against the City of Paris, Ray, Parrish and others in the United States District Court for the Central District of Illinois, Urbana Division, under Cause No. 07-cv-02224 ("the *Steidl* lawsuit"). A true and accurate copy of the *Steidl* lawsuit is attached hereto as **Exhibit A**.

13.     On February 27, 2008, Whitlock filed an eleven-count Complaint against the City of Paris, Ray, Parrish and others in the United States District Court for the Central District of Illinois, Urbana Division, under Cause No. 08-cv-02055 ("the *Whitlock* lawsuit"). A true and accurate copy of the *Whitlock* lawsuit is attached hereto as **Exhibit B**.

14.     The *Steidl* lawsuit alleges the following with regards to the City of Paris, Ray and/or Parrish: 1) Count I alleges a 42 U.S.C. § 1983 claim for false imprisonment against Ray and Parrish; 2) Count II alleges a 42 U.S.C. § 1983 claim for deprivation of right to fair trial and for wrongful conviction against Ray and Parrish; 3) Count III alleges a 42 U.S.C. § 1983 due process claim for deprivation of access to courts against Ray and Parrish; 4) Count IV alleges a 42 U.S.C. § 1983 *Monell* policy claim against the City of Paris; 5) Count V alleges false imprisonment against Ray and Parrish; 6) Count VI alleges malicious prosecution against Ray and Parrish; 7) Count VII alleges intentional infliction of emotional distress against Ray and Parrish; 8) Count VIII alleges conspiracy claim against Ray and Parrish; 9) Count IX alleges a *respondeat superior* claim against Ray and Parrish as employees of the City of Paris; and 10) Count X alleges 745 ILCS 10/9-102 and common law claims against the City of Paris.

15.     The *Whitlock* lawsuit alleges the following with regards to the City of Paris, Ray and/or Parrish: Count I alleges a 42 U.S.C. § 1984 claim for deprivation of right to fair trial, deprivation of due process and wrongful conviction against Ray and Parrish; Count II alleges a 42 U.S.C. § 1983 claim for malicious prosecution against Ray and Parrish; Count III alleges false

3

imprisonment against Ray and Parrish; Count IV alleges a 42 U.S.C. § 1983 *Monell* policy claim against City of Paris; Count V alleges a state law claim for false imprisonment against Ray and Parrish; Count VI alleges a state law claim for malicious prosecution against Ray and Parrish; Count VII alleges a state law claim for intentional infliction of emotional distress against Ray and Parrish; Count VIII alleges a state law claim for conspiracy against Ray and Parrish; Count IX alleges a state law respondesat superior claim against the City of Paris; and Count X alleges 745 ILCS 10/9-102 and common law claims against the City of Paris.

16.    Both the *Steidl* and *Whitlock* lawsuits allege that the admissions to police and trial testimony of two alleged eye witnesses – Darrel Herrington ("Herrington") and Deborah Rienbolt ("Rienbolt) – were manufactured, coerced, manipulated and knowingly false.

17.    Both the *Steidl* and *Whitlock* lawsuits further allege that Parrish and Ray knew that the admissions and trial testimony of Herrington and Rienbolt were manufactured, coerced, manipulated and knowingly false, yet conducted their investigation, obtained arrest warrants for Steidl and Whitlock and testified at Steidl and Whitlock's trials by relying upon these statements.

18.    Both the *Steidl* and *Whitlock* lawsuits also allege that Parrish and Ray knowingly suppressed exculpatory information from official police reports that would have exonerated Steidl and Whitlock.

19.    Both Steidl and Whitlock unsuccessfully sought relief from their alleged wrongful convictions from 1987 through 2003.

20.    Both the *Steidl* and *Whitlock* lawsuits allege that part of the basis for the denial of such relief from 1987 through 2003 was the false testimony of Herrington and Rienbolt that was manufactured by Parrish and Ray, as well as the exculpatory evidence withheld by Parrish and Ray.

4

21.    On June 17, 2003, the Federal District Court granted Steidl's petition for *writ of habeus corpus*, which had been filed on October 5, 2001, vacating Steidl's conviction and allowing the state 120 days to release or retry him.

22.    On September 6, 2007, the Illinois Appellate Court for the Fourth District reversed Whitlock's conviction and judgment and remanded the case for a new trial.

23.    On May 28, 2004, Steidl was released from custody.

24.    On January 8, 2008, Whitlock was released from custody.

**Defense of the *Steidl* and *Whitlock* Lawsuits**

25.    The City of Paris, on its own behalf and on behalf of Parrish and Ray, tendered defense of the *Steidl* lawsuit to Western World, Selective and Monticello, its insurers that provided insurance coverage from 1987 through 2004.

26.    Selective agreed to defend the City of Paris for the *Steidl* lawsuit subject to a strict reservation of rights.  Selective denied coverage to Ray and Parrish.

27.    Monticello and Western World agreed to defend the City of Paris, Parrish and Ray for the *Steidl* lawsuit subject to a strict reservation of rights.

28.    Western World, Selective and Monticello all agreed to honor the City of Paris' request to have Attorney James Sotos act as lead defense counsel for the City of Paris, Parrish and Ray in the *Steidl* lawsuit.

29.    The City of Paris, Parrish and Ray have at all times been defended in the *Steidl* lawsuit by independent counsel of their own choosing.

30.    Western World, Selective and Monticello initially entered into an informal agreement to equally fund the defense of the City of Paris, Parrish and Ray in the *Steidl* lawsuit.

31.    On April 3, 2007, Western World sent correspondence to Selective and Monticello, with a carbon-copy to independent counsel for the City of Paris, Parrish and Ray, indicating Western World's withdrawal from the informal funding agreement based upon Western World's position as an excess carrier.  A true and accurate copy of the April 3, 2007 correspondence is attached hereto, made a part hereof and marked as **Exhibit B**.

32.    In the April 3, 2007 correspondence, Western World asked that the parties continue to submit reports of the *Steidl* lawsuit to Western World as an excess carrier.

### The Various Insurance Policies

33.    Western World issued certain Law Enforcement Officers Liability insurance policies to the City of Paris, Illinois, Paris Police Department as named insured.

35.    Western World issued Policy No. LEL11749, effective December 27, 1985 through December 17, 1986.

36.    Western World issued subsequent policies with identical insuring agreements to the City of Paris Police Department on an annual basis through January 12, 1994, under policy nos. LEL12711; LEL12731; and LEL12753 (hereinafter "the earlier Western World policies"). A true and accurate copy of the insuring agreement for the earlier Western World policies is attached hereto as **Exhibit C**.

37.    The earlier Western World policies identically provide, in pertinent part, as follows:

#### INSURING AGREEMENTS

The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of negligent acts, errors or omissions of the Insured as follows:

Coverage A – Personal Injury
Coverage B – Bodily Injury

6

*       *       *

to which this policy applies, and the company shall have the right and duty to
defend any suit against the insured seeking damages on account of such personal
injury or bodily injury, even if any allegations of the suit are groundless, false or
fraudulent, and may make such investigation and settlement of any claim or suit
as it deems expedient, but the company shall not be obligated to pay nay claim or
judgment or to defend any suit after the applicable limit of the company's liability
has been exhausted by payment of judgments or settlements.

*       *       *

## CONDITIONS

*       *       *

**D.     OTHER INSURANCE**

The insurance under this policy shall be excess insurance over any other valid and
collectible insurance available to the insured, either as an insured under another
policy or otherwise.

38.     Western World subsequently provided the City of Paris Police Department with

Law Enforcement Officers Liability insurance under policy no. NLE02201, effective annually

from January 12, 1994 through January 12, 1996 (hereinafter "the later Western World

policies").  A true and accurate copy of the insuring agreement for the later Western World

policies is attached hereto as **Exhibit D**.

39.     The later Western World policies identically provide, in pertinent part, as follows:

**4.     <u>Other Insurance</u>**

If other valid and collectible insurance is available to the insured for a loss we
cover as a "law enforcement incident", our obligations are limited as follows:

*       *       *

b.     If the other insurance available to you was not issued by us,
the insurance available under this policy shall be excess
insurance over any other valid and collectible insurance
available to the insured.

7

40.     Monticello provided police professional liability coverage to City of Paris as named insured on an annual basis from December 27, 1995 to December 27, 1999 ("the Monticello policies"). Upon information and belief, a true and accurate copy of the Monticello policy effective during this time frame is attached hereto as **Exhibit E**.

41.     Upon information and belief, the Monticello policies effective during this time frame identically provide, in pertinent part, as follows:

**COVERAGE B. PERSONAL INJURY LIABILITY**

**1.      Insuring Agreement.**

      a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" to which this insurance applies. The "personal injury" must be caused by an "occurrence" and arise out of the performance of the insured's law enforcement duties.

*     *     *

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

We will pay, with respect to any claim or "suit" we defend:

1.      All expenses we incur.

*     *     *

3.      All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit". . . .

*     *     *

These payments will not reduce the limits of insurance.

*     *     *

**SECTION IV – CONDITIONS**

*     *     *

8

4.    **Other Insurance.**

    a.    The Insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.  When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of our liability under this policy shall no be reduced by the existence of such other insurance.

42.    Selective provided police professional liability insurance coverage to City of Paris as named insured, effective annually from December 27, 1999 through December 27, 2005 ("the Selective policies").  Upon information and belief, a true and accurate copy of the Selective policy effective during this time frame is attached hereto as **Exhibit F**.

43.    Upon information and belief, the Selective policies effective during this time frame identically provide, in pertinent part, as follows:

**COVERAGE B. PERSONAL INJURY LIABILITY**

1.    **Insuring Agreement.**

    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" to which this insurance applies.  No other obligation or liability to pay sums or perform acts or services is covered  unless explicitly provided for under SUPPLEMENTARY  PAYMENTS – COVERAGES A AND B.

\*        \*        \*

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.**

we will pay, with respect to any claim or "suit' we defend:

1.    All expenses we incur.

\*        \*        \*

3.    All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit". . .

\*        \*        \*

9

These payments will not reduce the Limits of Insurance

\*       \*       \*

**SECTION IV – POLICE PROFESSIONAL LIABILITY CONDITIONS**

\*       \*       \*

**4.      Other Insurance**

a.      The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.  When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of our liability under this policy shall not be reduced by the existence of such other insurance.

**Count I**
**(Declaratory Judgment: Western World, as an excess carrier, has no obligation to share in the funding of its insureds' defense in the *Steidl* or *Whitlock* lawsuits)**

44.      Western World adopts and repeats the allegations of Paragraphs 1 through 43 as and for Paragraph 44 hereof and as though the same were fully set forth herein.

45.      The *Steidl* and *Whitlock* lawsuits allege a single tortious act continuing in successive policy periods insured by Western World, Selective and Monticello.

46.      The risk insured by the Western World policies and triggered by the *Steidl* and *Whitlock* lawsuits is also covered by the Selective and Monticello policies.

47.      The Selective and Monticello policies provide primary coverage for the defense of the City of Paris, Parrish and Ray in the *Steidl* and *Whitlock* lawsuits.

48.      The Western World policies provide excess coverage over the Selective and Monticello policies for the defense of the City of Paris, Parrish and Ray in the *Steidl* and *Whitlock* lawsuits.

10

49.    By agreeing to fund independent counsel for the City of Paris, Parrish and Ray to defend the *Steidl* lawsuit, Selective and Monticello agreed to pay all defense costs, not just the defense costs arising out of damages that occurred during the Selective or Monticello policy periods.

50.    Western World does not seek to abrogate its obligations to the City of Paris, Parrish or Ray upon exhaustion of the limits of liability under the Selective and Monticello policies, except as previously set forth in its reservation of rights letter.

51.    The above contentions of Western World are, on information and belief, denied by Selective and Monticello, which, in turn, contend that Western World owes primary coverage for the *Steidl* and *Whitlock* lawsuits.  Western World, in turn, denies the contrary contentions of Selective and Monticello and each of them.

Wherefore, the Plaintiff, Western World Insurance Group, respectfully requests that this Honorable Court enter an order finding and declaring the rights of the parties as follows:

a.    That Western World Insurance Group is an excess carrier and has no current obligation to defend the City of Paris, James Parrish or Gene Ray under its policies of insurance Nos. LEL11749; LEL12711; LEL12731; LEL12753; and NLE002201, for the allegations of the lawsuit filed by Gordon Randall Steidl in the United States District Court for the Central District of Illinois, Urbana Division, under Cause No. 07-cv-02224.

b.    That Western World Insurance Group is an excess carrier and has no current obligation to defend the City of Paris, James Parrish or Gene Ray under its policies of insurance Nos. LEL11749;

11

LEL12711; LEL12731; LEL12753; and NLE002201, for the
allegations of the lawsuit filed by Herbert Whitlock in the United
States District Court for the Central District of Illinois, Urbana
Division, under Cause No. 08-cv-02055.

c.   That this Court grant Western World Insurance Group such other
and further relief as it deems just and fit under the circumstances.

d.   That Western World Insurance Group be awarded and have
and recover its just and reasonable costs incurred herein and have
execution issued therefore.

Respectfully submitted,

JOHNSON & BELL, LTD.

By: _____
        One of its Attorneys

Glenn F. Fencl ARDC No. 3126086
Richard Gordon ARDC No. 6277551
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
*Attorneys for Plaintiff,*
*Western World Insurance Group*

**Doc. #1864873**

# CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Western World Insurance Group | Selective Insurance Company of South Carolina and Monticello Insurance Company n/k/a Allianz Global Risk U.C. |

| (b) County of Residence of First Listed Plaintiff  Cheshire County | County of Residence of First Listed Defendant  Mecklenberg County |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Johnson & Bell, Ltd.<br>33 W. Monroe Street, Suite 2700<br>Chicago, IL 60603 | |

**FILED**

MAY 27 2008

08-2118

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [X] 2 | [X] 2 | Incorporated and Principal Place of Business In Another State | [X] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [X] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (excl. vet.)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Inj. | **PERSONAL INJURY**<br>[ ] 362 Personal Injury—Med. Malpractice<br>[ ] 365 Personal Injury—Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 610 Agriculture<br>[ ] 620 Other Food & Drug<br>[ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 630 Liquor Laws<br>[ ] 640 R.R. & Truck<br>[ ] 650 Airline Regs.<br>[ ] 660 Occupational Safety/Health<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 840 Trademark | [ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce/ICC Rates/etc.<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit<br>[ ] 490 Cable/Satellite TV<br>[ ] 810 Selective Service<br>[ ] 850 Security/Commodity/Exch.<br>[ ] 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | [ ] 891 Agricultural Acts<br>[ ] 892 Economic Stabilization Act<br>[ ] 893 Environmental Matters<br>[ ] 894 Energy Allocation Act |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 444 Welfare<br>[ ] 445 ADA—Employment<br>[ ] 446 ADA—Other<br>[ ] 440 Other Civil Rights | [ ] 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Mgmt. Relations<br>[ ] 730 Labor/Mgmt.Reporting & Disclosure Act<br>[ ] 740 Railway Labor Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Empl. Ret. Inc. Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 895 Freedom of Information Act<br>[ ] 900 Appeal of Fee Determination Under Equal Access to Justice<br>[ ] 950 Constitutionality of State Statutes<br>[ ] 890 Other Statutory Actions |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

28 U.S.C. 2201
Declaratory Judgment Action regarding primary/excess

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

| VIII. REQUESTED IN COMPLAINT: | [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:  [ ] Yes  [X] No |
|---|---|---|---|

**IX. This case**
- [X] is not a refiling of a previously dismissed action.
- [ ] is a refiling of case number _____, previously dismissed by Judge _____

| DATE  May 22, 2008 | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

E-FILED
Tuesday, 27 May, 2008  01:55:32 PM
Clerk, U.S. District Court, ILCD

E-FILED
Wednesday, 05 December, 2007 12:31:55 PM
Clerk, U.S. District Court, ILCD

E-FILED
Friday, 27 May, 2008  11:16:34 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| GORDON RANDY STEIDL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. |
| CITY OF PARIS, Present and Former Paris | ) | |
| Police Officials Chief Gene Ray and Detective James | ) | |
| Parrish; former Illinois State Trooper Jack Eckerty; | ) | JURY TRIAL DEMANDED |
| former Edgar County State's Attorney Michael | ) | |
| McFatridge; EDGAR COUNTY; and Illinois State | ) | |
| Police Officials Steven M. Fermon, Diane Carper, | ) | |
| Charles E.Brueggemann, Andre Parker, and | ) | |
| Kenneth Kaupus, | ) | |
| | ) | |
| Defendants. | ) | |

COMPLAINT

I. INTRODUCTION

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq.; the Judicial

Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental

jurisdiction, as codified in 28 U.S.C. § 1367(a).

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper

under 28 U.S.C. § 1391(b).  The parties reside, or, at the time the events took place, formerly resided

in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

II. PARTIES

3. Plaintiff Gordon Randy Steidl is a fifty-three year old man, and a resident of the United

States.

1

PLAINTIFF'S
EXHIBIT

A

4. Defendant Gene Ray was a duly appointed and sworn Chief of the Paris Police Department. He was a final policymaker for the City of Paris in police matters, including police investigations, was personally in charge of the Rhodes homicide investigation, and is sued in his individual capacity.

5. Defendant James Parrish was a duly appointed and sworn Paris Police detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

6. Defendant Jack Eckerty was a duly appointed and sworn Illinois State Police trooper who was the lead state police investigator in the Rhoads homicide investigation, and is sued in his individual capacity.

7. Defendant Michael McFatridge was the Edgar County State's Attorney, and is sued in his individual capacity.

8. Defendant City of Paris is an Illinois municipal corporation, as such is responsible for the policies, practices and customs of the Paris Police Department, and its Chief of Police, and was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

9. Defendant Edgar County is a governmental entity within the State of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar County and the Edgar County State's Attorney's Office are necessary parties to this lawsuit.

10. Defendants Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker and Ken Kaupus were duly appointed and sworn command level Illinois State Police officials who

2

supervised that agency's investigation of the Rhoads murders, and are sued in their individual capacities.

11. At all times relevant to this action, each of the named Defendants acted within the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois. Each Defendant's actions constituted "state action" as defined under federal law.

### III. FACTS

12. In May of 1986, Plaintiff Randy Steidl went to the local F.B.I. office and informed a special agent that he had information that Defendant McFatridge was involved in illegal gambling and narcotics.

13. In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house set on fire.

14. Paris is a small Eastern Illinois town, which in 1990 had a population of 8,943. Paris is located in Edgar County, which had a 1990 population of 21,725. According to the local newspaper, the Paris Beacon News, "no single event in the history of Paris - including a 1930s shootout between the police and booze running gangsters in front of the Hotel France - has so shocked and stirred this community as the Sunday morning discovery of Dykes and Karen Rhoads stabbed to death in their bedroom and their house set afire to hide the crime."

15. Defendants Ray, Parrish, Eckerty and McFatridge immediately opened an investigation, for which they were jointly responsible and in which they jointly participated, into these extremely high profile murders.

16. Within days, Defendants Ray, Parrish, Eckerty and McFatridge were provided with a credible lead to John Doe, a prominent Paris businessman who had been Karen Rhoads' employer,

3

and several of his employees. This lead included a credible motive in support of these individuals' involvement in the crime, as well as suspicious post murder conduct by John Doe which included his presence at the scene of the crimes shortly after the investigators arrived, his suggestion of a motive for the crime, and his offering of a $25,000 reward in the bars of Paris only hours later, an offer which quickly spread by "word of mouth."

17.   Several years before, Defendant Parrish worked for John Doe, and observed suspicious activities at one of Doe's businesses.

18.   Despite recognizing the significance of the leads which established John Doe and several of his employees as suspects, Defendants Parrish, McFatridge, Ray and Eckerty did not further pursue them, but instead sought to frame the Plaintiff and Herbert Whitlock for this crime.

19.   On or about July 9, 1986, directly after John Doe offered Plaintiff the reward at a local bar, Defendants Eckerty and Parrish, at the direction and approval, and/or with the knowledge of, Defendants Ray and McFatridge, took Plaintiff into custody and questioned him about the crimes.

20.   Plaintiff provided a truthful alibi, as did Whitlock, who was also questioned, to Defendants Ray, Parrish, Eckerty and McFatridge. These alibis were verified by these Defendants and their agents, but the public "arrests" began a local rumor mill which falsely branded Plaintiff and Whitlock as suspects in the public eye.

21.   On September 19, 20, and 21, 1986, Defendants Parrish, Ray, Eckerty and McFatridge interviewed Darrell Herrington, who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the town drunk, and frequented the bars where the reward had been offered.

4

22.   Herrington first told Defendants Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders, and that two men, Jim and Ed, committed the crimes.

23.   Herrington also told these Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

24.   After three days of interrogation, during which Defendants subjected Herrington to suggestion, coercion, manipulation, and plied him with liquor and promises, Herrington falsely identified Plaintiff and Whitlock as the persons whom he had accompanied to the scene of the murders, and falsely asserted that he saw Plaintiff Steidl leaving the scene, bloody, with a knife in his hand.

25.   On the basis of this coerced, manipulated, manufactured, and suggested false statement, Defendants Ray, Parrish, Eckerty and McFatridge then obtained, without probable cause, a warrant to electronically overhear conversations of the Plaintiff and Whitlock, and utilized Herrington as a wired informant in an unsuccessful attempt to entrap Steidl and Whitlock to make false inculpatory statements.

26.   Defendants Ray, Parrish, Eckerty and McFatridge then subjected Herrington to a polygraph examination on September 29, 1986. Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation . . . (consistent with) not telling the truth" as to "one or more" of these questions.

27.   Knowing that Herrington's coerced, manipulated, suggested and manufactured story was now exposed as completely false and incredible, and therefore bereft of probable cause, Defendants

5

Ray, Parrish, Eckerty and McFatridge failed to follow the examiner's recommendation that Herrington be subjected to another polygraph examination, and decided at that time not to falsely charge Plaintiff and Whitlock with the murders.

28. Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced Herrington's coerced, manipulated, suggested and manufactured false and incredible story to official police reports, while suppressing from those reports the highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was false, incredible, and the product of coercion, fabrication, manipulation, suggestion, promises, financial rewards, and alcohol.

29. For the next several months, Defendants Parrish, Eckerty, Ray, and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics, promises, rewards, liquor and, on at least one occasion, hypnosis, in order to further manufacture and fabricate false evidence against Plaintiff and Whitlock.

30. Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, suppressed from their official reports this continued coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of the statement taken under hypnosis.

31. On February 16, 1987, seven months after the yet unsolved murders, knowing that they had no credible evidence to charge Plaintiff and Whitlock, Defendants Parrish, Eckerty, Ray and McFatridge pursued another completely unstable individual, a known alcoholic and drug addict named Deborah Rienbolt, who was on felony probation and whom Parrish had previously pressured to be his informant.

6

32.  Defendant Parrish accused Rienbolt of involvement in the murders, and, despite her denials, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, interrogated Rienbolt about the crimes.

33.  During the initial interrogation, Defendants Eckerty and Parrish, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly coerced, manipulated and suggested to Rienbolt that she was present at the crime scene, and participated in the murders with Steidl and Whitlock, which were committed because Dyke Rhoads backed out of a drug deal.

34.  During this interrogation, Rienbolt falsely stated, as a direct result of the Defendants' coercion, suggestion, and manipulation, that a knife which Rienbolt had previously produced, and which in fact belonged to her husband and had no involvement in the murders, belonged to Whitlock, and that he had given it to her shortly after the crime, with blood on it.

35.  Although Defendants knew that Rienbolt had gone to work and later consumed vast quantities of drugs and alcohol the night before the murders, they created, through coercion, suggestion, and manipulation, a false statement that Rienboldt saw Plaintiff, Whitlock and Herrington together the night before the murders; that Whitlock had made threats to harm Dyke and Karen Rhoads; that later that night, she saw Plaintiff's car near the scene of the crime and saw Whitlock come around the corner of the victims house; that the next morning Whitlock came by her house, she saw blood on his neck, and Whitlock said he would pay her to remain quiet; and that Whitlock subsequently made additional admissions to her.

36.  Despite their failure to coerce and manipulate Rienbolt into falsely stating that she witnessed Steidl and/or Whitlock commit the murders and arson, Defendants Parrish, Eckerty, Ray

7

and McFatridge, on February 19, 1987, obtained arrest warrants for Plaintiff and Whitlock for the murders of Karen and Dyke Rhoads and for arson, and, on that basis, caused to be arrested and/or did arrest Plaintiff and Whitlock.

37. These arrest warrants and the resultant arrests were based on the knowingly false statements of Herrington and Rienbolt which the Defendants had coerced, fabricated, manipulated, and suggested, and were without probable cause. When questioned at the jail, both Plaintiff and Whitlock denied involvement in the crimes.

38. Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced Rienbolt's coerced, manipulated, suggested and manufactured story to official police reports, while suppressing from those reports the highly exculpatory information that these statements were false and incredible, contrary to physical and other evidence, and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

39. On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of the Plaintiff and Whitlock, and utilized Rienbolt as a wired informant in an unsuccessful attempt to entrap Steidl and Whitlock to make false inculpatory statements.

40. On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva, and blood from the persons of the Plaintiff and Whitlock; however, these searches did not lead to any inculpatory evidence against them.

8

41.     As part of their concerted effort to manufacture further false inculpatory evidence against Plaintiff, Defendants planted a completely unreliable jailhouse "snitch" in a cell next to the Plaintiff, and, as a direct result of their promises of an extremely lenient sentence and other rewards, manipulation, and suggestion, this jailhouse "snitch" provided knowingly false and incredible inculpatory statements which he falsely attributed to Plaintiff.

42.     On the basis of Rienbolt and Herrington's false statements which had been coerced, manipulated, manufactured, and suggested by Defendants Parrish, Eckerty, Ray and McFatridge, Plaintiff and Whitlock were subsequently charged by information with murder and arson; then, on March 10, 1987, Plaintiff and Whitlock were indicted for these crimes by the Edgar County Grand Jury after Defendant Parrish presented these statements to the grand jury in false and perjured testimony.

43.     Defendants Parrish, Ray and Eckerty specifically suppressed from the Grand Jury all the exculpatory evidence which demonstrated that these statements were false, coerced, manipulated, manufactured and suggested; that the Plaintiff and Whitlock were innocent, and that the Defendants had identified other likely suspects unrelated to Plaintiff and Whitlock .

44.     Defendants Parrish, Eckerty, McFatridge, and Ray continued to use coercion, manipulation, and suggestion on Deborah Rienbolt, using, *inter alia*, threats of physical force, threats of prosecution, promises of leniency, money, and drug treatment, until Rienbolt, who was under the influence of alcohol and drugs, relented under their pressure and made further fabrications concerning the murders, to wit:

a.     On March 29, 1987, Defendant Parrish, under the supervision and with the participation and/or knowledge of Defendants McFatridge, Eckerty and Ray, interrogated Rienbolt

and compelled her to falsely state that the night of the murders, Whitlock made statements to her that he, Plaintiff, and Herrington were going to the Rhoads house to deal with Dyke concerning drugs, that she gave the knife to Whitlock, that she was present at the scene of the crimes, heard screaming, saw the bodies, and later got the knife back from Whitlock with blood on it;

   b. In early April1987, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants McFatridge and Ray, again interrogated Rienbolt on several occasions and compelled her to falsely state that she was present at the crime and held Karen Rhoads while Plaintiff and Whitlock stabbed her and Dyke Rhoads, and that Plaintiff and Whitlock later paid her money not to talk.

  45. In March and April of 1987, Defendants Eckerty and Parrish, with the participation and/or knowledge and approval of Defendants McFatridge and Ray, similarly coerced, manipulated and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson, which purportedly corroborated portions of Rienbolt's testimony, knowing such testimony to be false.

  46. Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced these coerced, manipulated, suggested and manufactured false stories and statements of Rienboldt, Smith, and Robinson to official police reports, while suppressing from those reports, the highly exculpatory information that these statements were false and incredible, contrary to physical and other evidence, and based on fabrication, coercion, suggestion, threats and promises.

10

2:07-cv-02224-MPM-DGB     # 1-2     Page 11 of 38

47. Defendant McFatridge made numerous false pre-trial public statements to the media concerning the Plaintiff, Whitlock, and the evidence against them, which statements were widely reported in the press.

48. In order to insure that Rienboldt would continue to tell her false story at Whitlock and Plaintiff's trials, the Defendants first forced her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a homicidal death, in exchange for a lenient sentence, relocation expenses, and other rewards. As part of this coercive agreement, the Defendants obtained Rienbolt's signature on a six page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated, false and incredible statements about the crime. This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement, and the Defendants made it clear to her that these additional crimes included murder, with a sentence of death.

49. Whitlock was tried in May of 1987 and convicted on the basis of the evidence which was manufactured, coerced and suggested by Defendants Parrish, Eckerty, Ray and McFatridge. This evidence and the guilty verdict was widely reported in the media, and together with McFatridge's false public statements, prejudiced the judge and jury against Plaintiff.

50. Subsequent to Whitlock's conviction, in June of 1987, Plaintiff was tried and convicted of murder and arson, and on June 16, 1987, sentenced to death on the basis of the false evidence fabricated, coerced, suggested, and manipulated by Defendants Parrish, Eckerty, Ray and McFatridge.

51. The Defendants suppressed from the Plaintiff and his lawyers, the Judge who presided over his case, and the jury that convicted him all of the highly exculpatory evidence set forth above,

11

as well as evidence of other potential suspects, and promises of leniency and payments that the Defendants made to Deborah Rienbolt.

52. Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial any physical evidence - - such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence - - which linked Plaintiff or Whitlock to the crime scene.

53. Directly after his conviction and sentencing, Plaintiff filed a notice of appeal, and a post conviction petition, challenging his conviction. The Attorney General's Office represented the State in these post trial proceedings.

54. After the trial, and during the post-trial proceedings, Defendants Parrish, Eckerty, Ray, and McFatridge, continued to suppress the fact that they had coerced, suggested, manipulated and manufactured the false and incredible evidence upon which Plaintiff and Whitlock were wrongfully convicted for crimes they did not commit, and that there were, and continued to be, more likely suspects.

55. Shortly after Plaintiff's conviction and sentencing, in August of 1987, Darrell Herrington and his wife told Defendants Parrish, Ray and other Paris police officers that Herrington had lied in his testimony at trial; that he saw John Doe at the bottom of the stairs at the crime scene just after the murders and before he saw Plaintiff and Whitlock; that Plaintiff and Whitlock had walked in after the crime, rather than having committed it; that John Doe said "you didn't see me," and later offered him $25,000 in cash, $25,000 in property, and a job with the promise he would not have to work, to keep his mouth shut; and that John Doe was shipping narcotics in bags of dog food produced by one of his companies.

12

56. Defendants Ray and Parrish recorded these highly exculpatory statements in notes and a police report which they suppressed, with the knowledge and/or at the direction and with the approval, of Defendant McFatridge, from the Plaintiff and Whitlock, their lawyers, and the Courts who were considering his appeal and post-conviction proceedings. These notes and report remained suppressed until 1998 when Plaintiff's investigator discovered them in a police storage garage.

57. In November of 1988, Herrington gave a statement to Plaintiff's lawyers in which he stated that his trial testimony had been suggested, manufactured, coerced and procured with alcohol and other promises by Defendants Parrish, Ray, Eckerty and McFatridge, that it was false and incomplete in important respects, that he did not see Plaintiff with a knife, and that he "wouldn't be surprised" if Plaintiff was not involved in the murders.

58. The Defendants became aware of Herrington's recantation shortly thereafter, and in response, Defendants Parrish and McFatridge further coerced Harrington, intervened with the Secretary of State to get Herrington's drivers' license restored, despite five DUI convictions, and waived payment of fines related to the convictions, in order to obtain his false repudiation of his recantation.

59. During 1988 and 1989, McFatridge and Parrish stayed in contact with Rienbolt, who had been sentenced to prison for concealment of a homicidal death, making further promises and accommodations in order to keep her from recanting her testimony and exposing how they had obtained false testimony from her through coercion, manipulation, promises, and suggestion.

60. In June of 1988, McFatridge, together with Rienbolt, authored a false letter to the editor, signed by Rienbolt, and obtained its publication in the local Paris newspaper in which she painted herself to be a courageous witness who had come forward against her own interests to give truthful

13

eyewitness testimony which resulted in the conviction of Plaintiff and Whitlock. This letter was designed to further prejudice Plaintiff's and Whitlock's appeal and post trial proceedings, create public sympathy for Rienbolt, and to further the Defendants' suppression of the truth about their frame up of the Plaintiff and Whitlock.

61. Later in 1988, Rienbolt, while in prison, and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

62. Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney on her behalf.

63. In January of 1989, Rienbolt told Steidl's appellate lawyer that Plaintiff "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," that Cheryl Costa "had some involvement with Slifer and the murders," and that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads but the police and the prosecutor ignored my statements."

64. Later in January of 1989, Defendants McFatridge and Parrish, upon learning of her recantations which implicated them and their fellow Defendants, used further coercion, threats and promises to obtain Rienbolt's false repudiation of these statements; in April of 1989 Defendant McFatridge attempted to get the Federal Marshal to sign a false and incomplete affidavit which

14

stated that "at no time did Deborah I. Rienbolt indicate that James Slifer or anyone else was also present at the murder scene of Dyke and Karen Rhoads," while omitting that Rienbolt had said that Slifer had ordered the murders.

65.    In February of 1989, Plaintiff filed a post conviction petition which raised, *inter alia*, the false testimony of Herrington and Rienbolt, and their recantations.

66.    In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiff's evidence, discrediting the recantations, and again falsely claiming that "one fact will never change - - -that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads."

67.    On the basis of Herrington and Rienboldt's original false, manufactured and coerced testimony and their repudiations of their recantations, all of which were coerced, suggested, fabricated and manipulated by Defendants Parrish, Ray, McFatridge and Eckerty; the Defendants' continued suppression of highly exculpatory evidence which demonstrated that this testimony was false, coerced, fabricated, suggested and manipulated, that Plaintiff and Whitlock were innocent of the crimes, and that other persons were more likely suspects; Parrish and Eckerty's false and perjurious testimony at the hearing; and the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign, the trial Judge denied Plaintiff's post conviction petition on March 20, 1990.

68.    In late 1990 or early 1991, Defendant McFatridge stepped down as State's Attorney of Edgar County.

15

69.    On January 24, 1991, the Illinois Supreme Court, relying on the same coerced, suggested, fabricated and manipulated evidence, and unaware of the highly exculpatory evidence which had been suppressed, affirmed the Plaintiff's conviction and death sentence and the denial of his post conviction petition.

70.    In 1992, Plaintiff filed a post conviction petition, which was amended in1995, and this petition was denied without an evidentiary hearing on October 25, 1995. This denial was a direct result of all of the false testimony, statements and repudiations of recantations which were coerced, suggested, fabricated, manipulated, and bought and paid for by Defendants Parrish, Ray, McFatridge and Eckerty; by the Defendants' continued suppression of highly exculpatory evidence which demonstrated that this testimony was false, coerced, fabricated, suggested and manipulated, that Plaintiff and Whitlock were innocent of the crimes, and that there were other suspects who were more likely involved in the crimes; and the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign.

71.    In February of 1996, Rienbolt gave a sworn court reported and videotaped statement to Plaintiff's lawyers in which she swore that her prior statements and  testimony were false.  She further swore she had not been present at the scene of the murders, that the knife she provided had not been the murder weapon, and that she had no knowledge of Plaintiff having been involved in the crime. She also averred that Defendants Parrish, Eckerty, Ray and McFatridge coerced, manipulated and suggested her statements and trial testimony which falsely inculpated Plaintiff and Whitlock.

72.    Less than a week after her 1996 recantation, Rienbolt, at the behest of Defendants Parrish, McFatridge and Eckerty, retracted her recantation of the previous week.

16

73. The Illinois Supreme Court reversed the dismissal of Plaintiff's amended post conviction petition on September 18, 1997, holding that Plaintiff was entitled to an evidentiary hearing, *inter alia*, on the basis of newly discovered evidence.

74. In 1998, the trial court conducted a post conviction evidentiary hearing at which the false evidence which was coerced, fabricated, manipulated and suggested by the Defendants was again introduced in support of denial of relief. Defendant McFatridge gave false and perjured testimony at this hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants McFatridge, Parrish, Ray and Eckerty continued to withhold and suppress from this hearing all of the exculpatory evidence of which they were aware.

75. On December 11, 1998, the trial court again denied Plaintiff post conviction relief on his conviction. This denial was based on the false, manufactured, coerced, and suggested evidence detailed above, McFatridge's false and perjured testimony, and the continued suppression of exculpatory evidence. The court did grant Plaintiff a new sentencing hearing.

76. The state declined to pursue the death penalty, and on February 18, 1999, Plaintiff was resentenced to natural life imprisonment. The Illinois Appellate Court affirmed denial of this post conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

77. In mid-April of 2000, Illinois State Police (ISP) Lieutenant Michale Callahan, who was District 10 Investigations Commander, was assigned to review the Rhoads murders in response to a letter from Plaintiff's attorney documenting newly discovered evidence.

78. In a memorandum to ISP Captain John Strohl, dated May 17, 2000, which was circulated up the ISP chain of command to Defendants Diane Carper and Andre Parker, and later to Defendant

17

Steven Fermon, Callahan documented a wealth of evidence gathered during his review which supported his conclusion that Plaintiff and Whitlock "had not been proven guilty beyond a reasonable doubt," and that John Doe "was at one time and should still be the focus of the investigation."

79.   Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Rienbolt and Herrington's testimony, including the following:

* Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand as to whether she saw Herrington and Plaintiff together on July 5th;
* Herrington's time line did not fit with the crime;
* A polygraph examiner found purposeful non cooperation of Herrington, and the examiner's recommendation that Herrington be re-examined was ignored by the Defendants;
* Rienbolt's testimony that she skipped work on the night of July 5th and was with Plaintiff and Whitlock was refuted by numerous witnesses;
* Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;
* Rienbolt later recanted her testimony that she was present at the murders and that Plaintiff was involved;
* Rienbolt lied about the knife;
* Rienbolt admitted that Parrish led her into her false testimony.

80.   In this May 17, 2000 memorandum, Callahan further set forth evidence which supported the determination that John Doe and several of his employees were, and continued to be, suspects in the Rhoads murders; in other related homicides; and in organized crime and narcotics trafficking, as well as Defendant Parrish's connection to John Doe. Much of this highly exculpatory evidence was known to Defendants Parrish, Eckerty, Ray and McFatridge, was suppressed from Plaintiff and Whitlock by them, and included:

* Karen Rhoads worked as Paris businessman John Doe's secretary and he frequently visited her apartment;

18

* John Doe was a suspect in two prior homicides including the murder of a former secretary;
* Karen Rhoads said that she had seen Doe and an employee load a large sum of cash and a machine gun in Doe's car and head for Chicago;
* Karen Rhoads had told Doe the Friday prior to the murders that she was quitting her job, he forbade her from doing so, and a big argument ensued;
* Two of Doe employees, who were known as his "right hand men," were implicated in the Rhoads murders;
* Doe was the first on the scene after the crimes were discovered, and he offered police investigators detailed scenarios as to how the murders might have occurred;
* Doe offered a $25,000 reward in the bars for information on the murders and Herrington later stated that Doe offered him $25,000 and a job to keep his mouth shut;
* Herrington also told Parrish and Ray that Doe was at the scene of the murders at the time they occurred;
* Parrish worked for Doe prior to the murders, observed what appeared to be illicit drug activities, and suspected him of being involved in drug distribution;
* Doe was a suspect in the Rhoads murders, and later stated that he knew he was a suspect because he "had his sources."

81. Lt. Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors, which were also disseminated to Defendants Carper and Parker, and later to Defendant Fermon. In these memos he further articulated a wealth of evidence exculpatory to Plaintiff and Whitlock which he had developed during his investigation of the Rhoads murders, about Defendants McFatridge, Eckerty, Parrish and their investigation of the murders, and John Doe's alleged involvement as a suspect in the murders, in narcotics trafficking, and other organized criminal activity. Much of this evidence was known to Defendants Parrish, Eckerty, Ray and McFatridge, and was suppressed from Plaintiff and Whitlock. These memos included the following exculpatory evidence and investigative findings and conclusions:

* a number of John Doe's employees, including those named as suspects in the Rhoads murders, allegedly made drug runs for John Doe;
* John Doe was a target in a narcotics investigation;
* the FBI was looking at John Doe for narcotics, money laundering, corruption, ties to organized crime, and in connection with several unsolved homicides;

19

2:07-cv-02224-MPM-DGB    # 1-2    Page 20 of 38

* a former Paris official said that Defendant McFatridge was "in the Mafia's pocket" and that his law school loans "were paid off by organized crime figures;"

* Defendants Eckerty and Parrish both admitted that John Doe was one of the main suspects in the Rhoads murders before Herrington and Rienbolt's statements were obtained;

* Callahan concluded that the Rhoads investigation was "not only incomplete, but that important leads were not followed up on;"

* negative information or evidence leaning to the innocence of Plaintiff and Whitlock was not disclosed because, as Eckerty admitted to Callahan, "McFatridge did not want any negative reports;"

* "besides the obvious weaknesses in the case and poor investigative efforts, there remains questions of corruption and payoffs orchestrating the convictions of Steidl and Whitlock;"

*the Assistant Attorney General litigating Plaintiff's case admitted that if they lost the pending appeal, they wouldn't try him again because they would not be able to get a conviction in a second trial;

* other Edgar County Police Chiefs told Callahan that "they used the town drunk and a lying bitch to railroad those boys," and that "we all know [John Doe] was behind it but hell, he owns half the town;"

* Herrington told the Rhoads family a year after the trial that he was sorry, that what happened that night did not happen the way he testified in Court, and that when he dies, there is a letter in a safe deposit box which will tell them what really happened;

* Herrington now does all of John Doe's drywalling, and is an affluent businessman with a fleet of cars;

* one of the suspects in the Rhoads murders stated that he had pictures of Defendant McFatridge doing cocaine with another John Doe employee;

* an admitted drug trafficker told Callahan that "the State's Attorney and the investigators" were "paid off" in the Rhoads case, and that Plaintiff and Whitlock were innocent;

* Karen Rhoads told a witness that she had seen John Doe and his right hand man loading a large sum of money and a machine gun into John Doe's car and head to Chicago; that she questioned why there was such a large cash flow through John Doe's business when it was accounts only; that two weeks before she was murdered, she told her mother that she had seen something at work she wished she didn't see, that she had no idea that John Doe was mixed up in something like this, that there was a part of the business that only John Doe and his right hand man were allowed to see, and that she had to "get out of there;" and two other witnesses overheard a very upset Karen Rhoads tell someone the Friday before her murder that she had quit working for John Doe, that she told John Doe that if he tried to stop her she would "open her mouth," and that John Doe said she could not quit;

* a gas station attendant informed the Parrish/Eckerty investigation that a tall blonde man with a pony tail bought 21 gallons of gas in seven 3 gallon containers the night of the murders;

*after the 48 Hours show on the Rhoads murders was aired, a John Doe associate and suspect in the murders stated that John Doe "orchestrated the murders;"

* John Doe and his right hand man were offering the $25,000 reward for information concerning the Rhoads murders before it was known that they were murdered.

2:07-cv-02224-MPM-DGB    # 1-2    Page 21 of 38

82. Lt. Callahan also documented that Eckerty, other law enforcement agents, and Eckerty's wife contacted Callahan to state that Eckerty was a good cop and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost.

83. Additional evidence demonstrated that John Doe had contributed large sums of money to high ranking Republican office holders and Callahan made this fact known to Defendants Carper, and Parker.

84. Despite all the evidence and investigative findings tendered by Lt. Callahan, Defendants Fermon, Carper, Brueggemann, and Parker blocked a full investigation of the Rhoads case, because it was 'too politically sensitive," limited the John Doe investigation to intelligence gathering, ordered Callahan to focus on assignments other than the Rhoads murders and John Doe, transferred Callahan from his investigative post, and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

85. Because of this obstruction by Defendants Fermon, Carper, Brueggemann, Kaupus and Parker, the investigation into the Rhoads murders and John Doe and his associates' role therein, and the development of further evidence exculpatory to Plaintiff and Whitlock which would have resulted therefrom, was thwarted.

86. Additionally, these same Defendants, by their above described obstruction, suppressed from the Plaintiff and Whitlock, as well as from the courts which were considering their cases, this wealth of exculpatory evidence which, together with the evidence previously and continuously suppressed by Defendants Eckerty, Parrish, Ray and McFatridge, would have resulted in their exoneration and release.

21

87. In late 2002, Plaintiff filed a petition for executive clemency with the Governor of the State of Illinois in which he asked for a pardon on the basis of innocence.

88. Defendant McFatridge launched a public campaign opposing the freeing of Plaintiff by pardon, clemency, or collateral relief. In so doing, he again made false public statements which prejudiced Plaintiff and his legitimate claims of innocence, for a new trial, and for release, which he was seeking in post conviction, habeas, and clemency and pardon proceedings.

89. In early January, 2003, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Plaintiff and Whitlock if Callahan represented to him that, based on his investigation, they were innocent.

90. Callahan, who could not provide any information or opinions without first receiving approval from the Defendants who were his superiors in the chain of command, immediately sought such approval.

91. Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann, and others, where he presented all the evidence and findings set forth above, and articulated his opinion, supported by all this evidence, that Plaintiff and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent, and that the jury never heard the truth. Callahan also told these Defendants that there was no credible evidence against Plaintiff and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected wrongdoing by McFatridge, Eckerty and Parrish, and that John Doe should continue to be the focus of the investigation.

92. At the briefing, Defendants Fermon, Carper, and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's

22

representative that Plaintiff and Whitlock were innocent; as a direct result, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative.

93. As a direct result of this obstruction and suppression by Defendants Fermon, Carper, and Brueggemann, as well as the previous and continuing suppression by Defendants Fermon, Carper, Brueggemann, Parker, Parrish, Eckerty, Ray and McFatridge, and McFatridge's campaign to defeat the granting of the innocence pardons, the Governor declined to make a determination on Plaintiff and Whitlock's request before leaving office, and their requests remain pending to this date.

94. On June 17, 2003, the Federal District Court granted Plaintiff's petition for writ of habeas corpus, which had been filed on October 5, 2001, vacating Plaintiff's conviction and allowing the state 120 days to release or retry him, and finding that "acquittal was reasonably probable if the jury had heard all of the evidence."

95. On March 25, 2004, Attorney General Lisa Madigan announced she would not appeal this order, stating that after carefully reviewing the evidence, her office found that information favoring the defense was never disclosed, and that Plaintiff was thus entitled to a new trial.

96. In a last ditch effort to influence the prosecutors to continue to hold Plaintiff in custody and retry him, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence, and falsely claimed that Plaintiff was guilty of the brutal murders.

97. In part as a result of McFatridge's public statements, Plaintiff was continued in custody until May 28, 2004, when the circuit court granted the motion of the Office of the State Appellate

23

Prosecutor, appointed by the court to prosecute Plaintiff, to nolle prosse the charges against Plaintiff.

98. On May 28, 2004, Plaintiff was released from Danville Correctional Center, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew he did not commit.

99. Herb Whitlock continues to actively challenge his conviction, from behind bars, as he serves his sentence of life without the possibility of parole.

100. As a direct result of the egregious misconduct of the Defendants in obtaining and continuing Plaintiff's malicious prosecution, wrongful conviction and false imprisonment, Plaintiff has suffered, and continues to suffer, extreme physical and mental pain and suffering, and serious and continuing psychological damage. He was forced to spend much of his adult life in cruel and inhumane conditions, falsely branded as a murderer, estranged from his children, daily contemplating his own execution, and the subject of physical attack.

101. Defendants Parrish, Eckerty, Ray, and McFatridge, later joined by Carper, Brueggerman, Fermon, Parker and Kaupus, acting jointly and with other unsued persons, including Paris businessman John Doe, Deborah Rienbolt, Darrell Herrington, and other police and prosecutorial investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights, and did deprive Plaintiff of said rights, including his rights to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment, and his rights to access to the Courts and to a fair and impartial trial, as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

2:07-cv-02224-MPM-DGB    # 1-2    Page 25 of 38

102. In furtherance of this conspiracy or conspiracies, the Defendants, together with their co-conspirators, each committed one or more of overt acts set forth above, including, but not limited to, the wrongful arrest, imprisonment, charging and prosecution and frame-up of Plaintiff and Herb Whitlock; the fabrication, manipulation, alteration, suggestion, and coercion of false and totally unreliable inculpatory evidence against Plaintiff and Whitlock; the failure to expose and/or stop the malicious prosecution, false imprisonment, and wrongful conviction of Plaintiff and Whitlock; the repeated deception of prosecuting attorneys who represented the state in post trial proceedings, judges, juries, and the Governor by, *inter alia,* making knowing misstatements and the presentation of this knowingly coerced, fabricated, suggested, false and incredible evidence to prosecutors and judges; the giving of false testimony and the filing of false and incomplete statements and reports; the suppression and destruction of favorable, exculpatory evidence; the failure to come forward with a truthful account of the events; the payment of money and other rewards to witnesses in order to obtain false testimony against Plaintiff and Whitlock; the obstruction of an investigation which was uncovering further exculpatory and exonerating evidence; the failure to investigate reliable leads that John Doe and his associates were suspects in the crime; the making of false public statements in order to influence prosecuting attorneys, judges, juries and the Governor and his staff in Plaintiff and Whitlock's cases, and the other acts set forth above.

103. Said conspiracy or conspiracies, joint actions and overt acts continue to this date, have caused and continue to cause Plaintiff's constitutional rights to be violated and the injuries, pain, suffering, fear, mental anguish, detention, imprisonment, humiliation, defamation of character and reputation, and loss of freedom and companionship, as set forth more fully above and below.

25

## COUNT I
### (42 U.S.C. §1983 Claim for False Imprisonment)

104. Plaintiff re-alleges paragraphs 1 through 103.

105. The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, in falsely arresting and imprisoning Plaintiff, and of these same defendants, together with Defendants Steven Fermon, Diane Carper, Charles Brueggemann, Andre Parker and Kenneth Kaupus, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, in continuing said imprisonment for seventeen years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

106. The actions of the Defendants in falsely arresting and imprisoning Plaintiff, continuing said false imprisonment, and covering up their own misconduct were a direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's Constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. §1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Conviction)

26

107. Plaintiff re-alleges paragraphs 1 through 106.

108.  Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, prosecution, and conviction of Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful conviction, by coercing, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from Plaintiff's defense attorneys, and the judges, juries, post trial prosecutors, and the Governor and his staff, who were involved in Plaintiff's criminal proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; by suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated the Plaintiff and his co-defendant, including evidence of other more likely suspects; by writing false reports and giving and tendering false testimony and statements at the grand jury, at trial, and at post-conviction and habeas corpus proceedings; by improperly influencing the judges, juries and executive bodies and officials hearing and considering Plaintiff's case, and the post trial prosecutors who continued his prosecution, *inter alia*, by making false public statements, by obstructing investigations which would have led to discovery of further exculpatory evidence, and by the additional wrongdoing set forth

27

above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

109. The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted were a direct and proximate cause of the injuries to Plaintiff which are set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, and Charles Brueggemann, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT III
**(42 U.S.C. §1983 Due Process Claim for Deprivation of Access to Courts)**

110. Plaintiff re-alleges paragraphs 1 through 109.

111. Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, by their wrongful charging, prosecution, conviction, and imprisonment, and these same Defendants, together with defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law

28

enforcement agents, by their resultant obstruction of justice and suppression of evidence, violated Plaintiff's right to access to the courts, *inter alia*, by suppressing evidence favorable to the claims asserted herein, and by causing Plaintiff to potentially forfeit several of his claims, including his Fourth Amendment and state law false arrest and illegal search claims, to delay pursuing his other claims for many years, and to proceed without key evidence which remains suppressed or has been destroyed, lost, or otherwise diminished due to the lapse in time, in violation of his Fifth and Fourteenth Amendment rights to due process of law and access to the courts.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, and Charles Brueggemann for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT IV
### (42 U.S.C. §1983 *Monell* Policy Claim Against City of Paris)

112. Plaintiff re-alleges paragraphs 1 through 111.

113. The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and Jack Eckerty as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Paris, its Police Department and Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting pursuant to, and as an agent of, the City of Paris.

114.  At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a) conducting physically, psychologically or otherwise illegally or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions, and convictions;

b) filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts or all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions, and evidence;

c) failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses, and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, arrestees, and other citizens, including, but not limited to, persons who were physically and/or psychologically abused during questioning;

d) the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-c above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence

30

2:07-cv-02224-MPM-DGB     # 1-2     Page 31 of 38

of which they were aware, despite their obligation under the law and police regulations to report such violations. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and their fellow officers have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant; and

e) covering up, suppressing, and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants which were not turned over to the prosecuting attorneys and/or defense lawyers.

115.    The patterns and practices set forth above were well known both before and after Plaintiff was wrongfully arrested, charged, imprisoned, and convicted, including by the commanding and supervisory Defendants named herein, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-defendant, and other victims, *inter alia*, in the manner set forth in this complaint.

116.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation, and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony; and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and

imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

117. The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the City of Paris in police matters, including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

WHEREFORE, Plaintiff demands judgment against Defendant City of Paris for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V
### (State Law Claim for False Imprisonment)

118. Plaintiff realleges paragraphs 1 through 117.

119. The imprisonment of Plaintiff, without probable cause, by Defendants Ray, Parrish, Eckerty and McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, and its continuation by these Defendants, together with Defendants Fermon, Carper, Parker, Kaupus and Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, constituted the tort of false arrest and imprisonment under Illinois law.

120. Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

32

WHEREFORE, Plaintiff Gordon Randy Steidl demands compensatory damages against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, punitive damages, and such other and additional relief as this court deems just and equitable.

### . COUNT VI
### (State Law Claim for Malicious Prosecution)

121. Plaintiff re-alleges paragraphs 1 through 120, and with specific particularity, paragraph 108.

122. Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff as set forth above.

WHEREFORE, Plaintiff Gordon Randy Steidl demands actual or compensatory damages against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann and, because these

33

Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

123.    Plaintiff re-alleges paragraphs 1 through 103 and 118 through 122.

124.    Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray, and Michael McFatridge, individually, jointly, and in conspiracy, with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in extreme and outrageous conduct by, *inter alia*, constructing, coercing, manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by procuring his prosecution, conviction, death sentence, and imprisonment for heinous crimes he did not commit, and by making false and defamatory public statements. Additionally, these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in additional extreme and outrageous conduct by suppressing additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

125. Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

34

126. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and difficulty in focusing or concentrating.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann for compensatory damages plus the costs of this action, and such other relief as this Court deems equitable and just.

### COUNT VIII
### (State Claim for Conspiracy)

127. Plaintiff re-alleges paragraphs 1 through 103 and 118 through 126.

128. Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, with other unsued co-conspirators, including John Doe, Deborah Rienbolt and Darrell Herrington, and other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

129. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above, including, but not limited to, those summarized in paragraph 102.

35

130.  Said conspirac(ies) and overt acts were and are continuing in nature, and were and are a proximate cause of Plaintiff's tortuous injuries under state law, as set forth above.

131.  Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE Plaintiff Gordon Randy Steidl demands compensatory damages, jointly and severally, from Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

### COUNT IX
#### (State Law Respondeat Superior Claim)

132.  Plaintiff re-alleges paragraphs 1 through 103 and 118 through 131.

133.  Defendants Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against the City of Paris for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

2:07-cv-02224-MPM-DGB   # 1-2   Page 37 of 38

## COUNT X
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)

134. Plaintiff re-alleges paragraphs 1 through 133.

135. Defendant City of Paris was the employer of Defendants Gene Ray and James Parrish at all times relevant and material to this complaint.

136. These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Paris.

WHEREFORE, Plaintiff, pursuant to 745 ILCS §10/9-102, and otherwise pursuant to law, demands judgment against the Defendant City of Paris, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

## COUNT XI
### (Edgar County and its SAO)

137. Plaintiff re-alleges paragraphs 1 through 136.

138. Defendant Edgar County and its State's Attorneys' Office was the employer of Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar County and its State's Attorneys' Office, said County is therefore responsible for any judgment entered against Defendant McFatridge and is therefore a necessary party hereto.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Edgar County and the Edgar County State's Attorney's Office in the amounts awarded to Plaintiff against Defendant McFatridge as damages, costs and interest, and for whatever additional relief this Court deems equitable and just.

37

**Plaintiff Demands A Jury Trial on all Counts of the Complaint**

Dated: May 27, 2005                    Respectfully submitted,

                                       GORDON RANDY STEIDL

                                       By:____/s/ Michael B. Metnick_____
                                                One of His Attorneys

G. Flint Taylor
Jan Susler
People's Law Office
1180 N. Milwaukee Ave.
Chicago, Il. 60622
773/235-0070

Michael Bruce Metnick
Metnick, Cherry, Frazier, and Sabin, L.L.P.
Suite 200 Myers Building
P. O. Box 12140
Springfield, IL 62791-2140
217/753-4242

38

E-FILED
Tuesday, 27 May, 2008 E-FILED 5 PM
Wednesday, 27 February 2008 02:53:40 PM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

**HERBERT WHITLOCK,**    )
                         )
                         )
**Plaintiff,**           )
                         )    **COPY**
v.                       )    No.
                         )
                         )
**CITY OF PARIS, Present and Former**   )    **JURY TRIAL DEMANDED**
**Paris Police Officials Chief Gene Ray and** )
**Detective James Parrish; former Illinois** )
**State Trooper Jack Eckerty; former**   )
**Edgar County State's Attorney Michael** )
**McFatridge; EDGAR COUNTY; and**        )
**Illinois State Police Officials Steven M.** )
**Fermon, Diane Carper, Charles E.**     )
**Brueggemann, Andre Parker, Kenneth**   )
**Kaupus and Jeff Marlow; and Deborah**  )
**Rienbolt,**            )
                         )
**Defendants.**          )

### COMPLAINT

NOW COMES Plaintiff, HERBERT WHITLOCK ("Whitlock"), by and through his

attorneys, Ronald H. Balson and Carrie A. Hall of the firm of Michael Best & Friedrich LLP,

and Richard S. Kling and Susana Ortiz of the Law Offices of Richard Kling, complaining of the

Defendants, and states as follows:

### I. JURISDICTION AND VENUE

1.    Jurisdiction of this matter is invoked upon this Court by virtue of 42 U.S.C. §

1983 et. Seq.; 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States, Articles

Four, Five, Six and Fourteen; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).



PLAINTIFF'S
EXHIBIT
B

2.    Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b). Defendants, or some of them, reside and/or formerly resided in this judicial district. A substantial part of the events giving rise to the claims asserted herein occurred within this district.

## II. PARTIES

3.    Plaintiff, Herbert Whitlock, is a sixty-one-year-old man and a citizen of the state of Illinois.

4.    Defendant Gene Ray ("Ray") was a duly appointed and sworn Chief of the Police Department of the City of Paris, Illinois. He was a final policymaker for the City of Paris in police matters, including police investigations, was personally in charge of the homicide investigation of Karen and Dyke Rhoads and is sued in his individual capacity.

5.    Defendant James Parrish ("Parrish") was a duly appointed and sworn Paris Police detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

6.    Defendant City of Paris is an Illinois municipal corporation and, as such, is responsible for the policies, practices and customs of the Paris Police Department and its Chief of Police. Defendant City of Paris was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

7.    Defendant Jack Eckerty ("Eckerty") was a duly appointed and sworn Illinois State Police ("ISP") trooper who was the lead state police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

2

8.    Defendant Michael McFatridge ("McFatridge") was the Edgar County State's Attorney and is sued in his individual capacity.

9.    Defendant Edgar County is a governmental entity within the state of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO).  Edgar County and the State's Attorney's Office are necessary parties to this lawsuit.

10.    Defendants Steven M. Fermon ("Fermon"), Diane Carper ("Carper"), Charles E. Brueggemann ("Brueggemann"), Andre Parker ("Parker"), Kenneth Kaupus ("Kaupus") and Jeff Marlow ("Marlow") (the "ISP Defendants") were duly appointed and sworn command level ISP officials who supervised that agency's investigation of the Rhoads murders and are sued in their individual capacities.

11.    At all times relevant to this action, the ISP Defendants acted within the scope of his or her employment and under the color of the laws, regulations and customs of the state of Illinois.  Each Defendant's actions constituted "state action" as defined under federal law.

12.    Defendant Deborah Rienbolt ("Rienbolt") is a private citizen of the state of Illinois.

### III.  FACTS COMMON TO ALL COUNTS

13.    In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house was set on fire.

14.    Defendants Ray, Parrish, Eckerty and McFatridge were responsible for investigating the homicides.  They jointly participated in said investigation commencing shortly after the crimes were discovered.

15.    Defendants Ray, Parrish, Eckerty and McFatridge discovered facts disclosing the identities of several credible suspects, including a prominent and influential Paris businessman

(the "Paris businessman"), who shortly after the murders offered a $25,000 reward. Defendant

Parrish had employment relationships off and on with the Paris businessman.

      16.    Despite the existence of substantial facts leading to the identification of credible

suspects, Defendants Ray, Parrish, Eckerty and McFatridge did not pursue them, but instead

jointly pursued a course of conduct designed to deflect the investigation away from the Paris

businessman, to quickly and expediently bring about a conviction and gain public and political

favor by promptly solving the murders. To that end, they conspired to accuse and convict

Gordon Randy Steidl ("Steidl") and Herbert Whitlock for these crimes. Defendants Ray, Parrish,

Eckerty and McFatridge then and there conspired and commenced acts in furtherance of

fabricating and creating a case against Steidl and Whitlock.

      17.    On or about July 9, 1986, directly after the Paris businessman offered the reward

at local bars, Defendants Parrish and Eckerty, at the direction and approval and/or with the

knowledge of defendants Ray and McFatridge, and without any physical evidence linking

Whitlock to the crimes, took Whitlock into custody and questioned him.

      18.    Although Whitlock denied any connection to the crimes and provided a truthful

alibi, Defendants Ray, Parrish, Eckerty and McFatridge continued to pursue him.

      19.    On September 19, 20 and 21, 1986, Defendants Ray, Parrish, Eckerty and

McFatridge interviewed Darrell Herrington ("Herrington"), who they knew had five drunken-

driving convictions and two convictions for passing bad checks, was considered the "town

drunk" and frequented the bars where the reward had been offered.

      20.    Herrington told Defendants Ray, Parrish, Eckerty and McFatridge that he was

present at the scene of the Rhoads murders and that two men, "Jim and Ed," committed the

crimes.

4

21.     On information and belief, Herrington also told these Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

22.     During Herrington's three days of interrogation, Defendants subjected Herrington to suggestion, coercion and manipulation and plied him with liquor and promises. As a result of Defendants joint efforts, Herrington changed his story from Jim and Ed to Steidl and Whitlock as the persons whom he had accompanied to the scene of the murders. Herrington was never charged with any crimes related to the Rhoads murders.

23.     Armed with Herrington's coerced, manipulated, manufactured and suggested false statement, Defendants Ray, Parrish, Eckerty and McFatridge, without probable cause, obtained a warrant to electronically eavesdrop on conversations of Whitlock. Their plan was to use Herrington as a wired informant to entrap Whitlock into making inculpatory statements. The plan failed. Despite their efforts, Whitlock steadfastly maintained he had no connection with the crime. Even though the scheme proved unsuccessful, Defendants Ray, Parrish, Eckerty and McFatridge were not dissuaded and continued to pursue their scheme to accuse and convict Steidl and Whitlock.

24.     Defendants Ray, Parrish, Eckerty and McFatridge subjected Herrington to a polygraph examination on September 29, 1986. Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation…(consistent with) not telling the truth" as to "one or more" of the questions.

25.     Fearing that Herrington's fabricated statement would not withstand further polygraph scrutiny, Defendants Ray, Parrish, Eckerty and McFatridge did not follow the

examiner's recommendation that Herrington be subjected to another polygraph examination.

Lacking a credible witness, they decided not to charge Steidl and Whitlock with the murders at

that time.  Nevertheless, Defendants Parrish and Eckerty, with the knowledge and approval of

Defendants Ray and McFatridge, officially recorded Herrington's fabricated and discredited story

in the Paris police reports, but intentionally suppressed and concealed from those reports the

highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and

that Herrington's story was the product of their coercion, fabrication, manipulation, suggestion,

promises, financial rewards and alcohol.

26.    For the next several months, Defendants Ray, Parrish, Eckerty and McFatridge

continued to meet with Herrington and to use coercive, suggestive and manipulative tactics,

promises, rewards, liquor and, on at least one occasion, suggestions by hypnosis, in order to

further manufacture and fabricate a more believable, story about Steidl and Whitlock.

27.    Defendants Parrish and Eckerty, with the knowledge and approval of Defendants

Ray and McFatridge, suppressed and concealed from their official reports, the continued

coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of

Herrington's statements taken under hypnosis.

28.    On February 16, 1987, seven months after the yet unsolved murders, knowing that

they had no credible evidence to charge Steidl and Whitlock, Defendants Ray, Parrish, Eckerty

and McFatridge began to meet with another completely unstable individual, a known alcoholic

and drug addict, Defendant Rienbolt, who was on felony probation and whom Parrish had

previously pressured to be his informant.

29.    Defendant Parrish accused Rienbolt of involvement in the murders, and, despite

her denials, Defendants Parrish and Eckerty, under the supervision and with the participation

6

and/or knowledge of Defendants Ray and McFatridge, continued to interrogate Rienbolt about the crimes.

30.    During the interrogations, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly pressured and challenged Rienbolt that she was present at the crime scene and participated in the murders with Steidl and Whitlock, which they postulated took place because Dyke Rhoads backed out of a drug deal.

31.    Defendants made promises of financial rewards, coerced, pressured, suggested and manipulated Defendant Rienbolt to create the story that her husband's knife really belonged to Whitlock and that Whitlock had given it to her shortly after the crime with blood on it.

32.    Defendant Rienbolt told to Defendants Parrish and Eckerty that she had gone to work at the Paris Health Center and later consumed vast quantities of drugs and alcohol on July 5, 1986. Defendant Rienbolt did not originally say she witnessed Steidl and/or Whitlock commit the murders and arson. Nevertheless, Defendants Parrish and Eckerty caused Rienbolt to change her story and make false statements that she didn't go to work, that she saw Steidl, Whitlock and Herrington together the night before the murders and other false statements about Whitlock and the scene of the murders. Defendant Rienbolt knew her statements were false and that they would be used to accuse and prosecute Steidl and Whitlock, but she agreed with Defendants to be an active participant and knowingly provide false statements to accuse and prosecute Steidl and Whitlock. On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of Steidl and Whitlock, and tried to use Defendant Rienbolt as a wired informant to entrap Whitlock at an AA meeting into making false

inculpatory statements. Defendant Rienbolt willingly attempted to trap him, but try as she may, Whitlock steadfastly and truthfully denied involvement.

33.     On February 19, 1987, on the basis of knowingly fabricated and false statements, Defendants Ray, Parrish, Eckerty and McFatridge obtained arrest warrants for Steidl and Whitlock for the murders of Karen and Dyke Rhoads and for arson and caused them to be arrested for said crimes. Following their arrest, when questioned at the jail, both Steidl and Whitlock truthfully denied involvement in the crimes.

34.     Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded Defendant Rienbolt's manufactured story in official police reports, while suppressing from those reports the highly exculpatory information on how these statements were obtained and that they were false and incredible, contrary to physical and other evidence and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

35.     On the basis of these coerced, manipulated, manufactured and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva and blood from the persons of Steidl and Whitlock. These searches did not lead to any inculpatory evidence against either Steidl or Whitlock, but Defendants continued to wrongfully pursue their scheme to accuse and prosecute Steidl and Whitlock.

36.     Using Defendant Rienbolt's and Herrington's false statements, Defendants wrongfully charged Steidl and Whitlock by information with murder and arson. On March 10, 1987, Steidl and Whitlock were indicted for these crimes by the Edgar County Grand Jury after Defendant Parrish presented false information, including these statements and perjured testimony

8

to the Grand Jury. Acting in concert with Defendants Ray, Parrish, Eckerty and McFatridge,

Defendant Rienbolt willfully and knowingly offered false testimony to the Grand Jury in an

effort to have Steidl and Whitlock indicted.

37.    Defendants Ray, Parrish and Eckerty specifically suppressed from the Grand Jury

exculpatory evidence which, if known to the Grand Jury, would have demonstrated that these

statements were false, coerced, manipulated, manufactured and suggested, that Steidl and

Whitlock were innocent, that the Defendants had identified other likely suspects unrelated to

Steidl and Whitlock, all of which would have likely resulted in a "no bill" and a failure to indict.

38.    Defendants Ray, Parrish, Eckerty and McFatridge continued to urge Defendant

Rienbolt to fabricate further stories, using, *inter alia*, threats of physical force, threats of

prosecution, promises of leniency, promises of money and drug treatment. Defendant Rienbolt,

who was continually under the influence of alcohol and drugs, made further fabrications

concerning the murders, to wit:

a.    On March 29, 1987, Defendant Parrish, under the supervision and with the

participation and/or knowledge of Defendants Ray, Eckerty and McFatridge interrogated

Rienbolt and induced her to falsely state that on the night of the murders, Whitlock made

statements to her that he, Steidl and Herrington were going to the Rhoads' house to deal with

Dyke concerning drugs, that she gave her husband's knife to Whitlock, that she was present at

the scene of the crimes, that she heard screaming, saw the bodies and later got the knife back

from Whitlock with blood on it.

b.    In early April 1987, Defendants Parrish and Eckerty, under the supervision

and with the participation and/or knowledge of Defendants Ray and McFatridge, again

interrogated Rienbolt on several occasions and compelled and induced her to further fabricate the

9

story that she was present at the crime scene and physically restrained Karen Rhoads while Steidl and Whitlock stabbed Dyke Rhoads multiple times and then stabbed Karen Rhoads multiple times and that Steidl and Whitlock later paid her money not to talk.

39.    In March and April of 1987, Defendants Parrish and Eckerty, with the participation and/or knowledge and approval of Defendants Ray and McFatridge, similarly coerced, manipulated and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson, in an attempt to corroborate portions of Defendant Rienbolt's testimony.  Defendants Parrish and Eckerty intimidated witnesses by shouting at them, threatening to put them in jail, shaking their fists, smacking their fists on the table and kicking chairs.  On one occasion Defendant Parrish so violently intimidated a witness named Barbara Furry, who was nine months pregnant, that he caused her to urinate on herself.

40.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, wrote and recorded these coerced, manipulated, suggested and manufactured false stories and statements of Defendant Rienbolt, Smith and Robinson in official police reports while suppressing from those reports the highly exculpatory information that these statements were false and incredible, obtained by coercion and intimidation, were contrary to physical and other evidence and based on fabrication, suggestion, threats and promises.

41.    In an attempt to influence public opinion and prospective jurors, Defendant McFatridge made numerous false pretrial public statements to the media concerning Steidl, Whitlock and the evidence against them, which statements were widely reported in the press. McFatridge's statements violated the Illinois Rules of Professional Conduct, specifically Rule 3.6, prohibiting publication of opinions on the guilt or innocence of accused persons.

42.     In order to insure that Defendant Rienbolt would continue to tell her false story at Steidl's and Whitlock's trials, the Defendants first put her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a homicidal death, in exchange for a lenient sentence, the payment of her "relocation expenses" and other rewards. As part of this coercive agreement, the Defendants obtained Defendant Rienbolt's signature on a six-page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated, false and incredible statements about the crime. This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement and the Defendants made it clear to her that these additional crimes included murder, with a possible sentence of death.

43.     Whitlock was tried in May of 1987 in Edgar County, Illinois. On the basis of the fabricated and manufactured evidence and because exculpatory materials were concealed from Whitlock and his attorney, the jury returned a verdict of guilty of the murder of Karen Rhoads, which it would not have done but for the wrongful conduct of Defendants Ray, Parrish, Eckerty, McFatridge and Rienbolt.

44.     In June of 1987, Steidl was tried and convicted of murder and arson in Vermilion County, and on June 16, 1987, sentenced to death on the basis of similar false and fabricated evidence and concealed exculpatory materials.

45.     During the course of their trials, Defendant McFatridge, with the cooperation of Defendants Ray, Parrish and Eckerty, did not reveal and took affirmative measures to withhold and suppress the following exculpatory materials favorable to Steidl and Whitlock:

a.     That there were numerous credible leads pointing to other suspects, including a prominent and influential Paris businessman;

11

b.  That witnesses were threatened and intimidated;

c.  There were failed polygraph tests by prosecution witnesses;

d.  There were money and favors given to prosecution witnesses in exchange for their testimony;

e.  Defendants arranged to give witnesses hypnotic suggestions;

f.  The Defendants provided alcohol to witnesses before and during the time they were giving statements;

g.  Herrington believed the murders were committed by two men named "Jim and Ed;"

h.  There was a cut on Herrington's hand the night of the murders.

i.  Defendants failed and refused to submit Herrington's blood standard to the ISP lab;

j.  Defendant Rienbolt testified she saw a piece of broken lamp in Steidl's hand.  The lamp was not broken until after the fire;

k.  That Defendant Rienbolt originally stated that she saw a broken vase which did not exist;

l.  That witnesses had identified someone other than Whitlock as a perpetrator;

m.  That prosecution trial witnesses were coached in their testimony and provided with fabricated stories; and

n.  That there was a previous business relationship between Defendant Parrish and the Paris businessman.

12

46.     The officers and the prosecutors had a legal duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny to disclose the foregoing, along with all evidence favorable to Whitlock.  Notwithstanding their duty, Defendants Ray, Parrish, Eckerty and McFatridge refused to disclose the foregoing and, in fact, concealed and deliberately obstructed access to exculpatory information.  Following the trial and conviction, other ISP employees who became aware of the undisclosed and concealed information, including Defendants Fermon, Carper, Brueggemann and Kaupus, had an affirmative *Brady* duty to disclose.

47.     Defendants Ray, Parrish, Eckerty and McFatridge suppressed from Whitlock and his lawyers, the Judge who presided over his case and the jury that convicted Whitlock all of the highly exculpatory evidence set forth above, as well as evidence of other potential suspects and promises of leniency and payments that the Defendants made to Defendant Deborah Rienbolt.

48.     Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial, nor thereafter, any physical evidence, such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence, which linked Whitlock to the crime scene.

49.     Directly after his conviction and sentencing, Whitlock filed a notice of appeal and a post-conviction petition challenging his conviction.  The Attorney General's Office represented the State in these post-trial proceedings.

50.     After the trial and during the post-trial proceedings, Defendants Ray, Parrish, Eckerty and McFatridge continued to suppress and withhold the exculpatory materials from Whitlock.  Being unaware of the exculpatory material, *Brady* issues which should have been considered were not effectively raised in post-conviction proceedings.

13

51.    Shortly after Whitlock's conviction and sentencing in August of 1987, Herrington and his wife told Defendants Ray, Parrish and other Paris police officers that 1) Herrington had lied in his testimony at trial; 2) that he saw the Paris businessman at the bottom of the Rhoads' stairs just after the murders and before he saw Steidl and Whitlock; 3) that Steidl and Whitlock had walked in after the crime rather than having committed it; 4) that the Paris businessman said to Herrington, "You didn't see me," and later offered him $25,000 in cash, $25,000 in property and a job with the promise he would not have to work, to keep his mouth shut; and 5) that the Paris businessman was shipping narcotics in bags of dog food produced by one of his companies.

52.    Defendants Ray and Parrish recorded these highly exculpatory statements in notes and in a police report during the time Whitlock was appealing his case, but they concealed them and did not disclose them to Whitlock or his attorneys. They suppressed the report and the retraction with the knowledge and/or at the direction and with the approval of Defendant McFatridge from Steidl and Whitlock, their lawyers and the Courts who were considering the appeals and post-conviction proceedings. These notes and reports remained suppressed until 1998 when investigator Bill Clutter discovered them in a police storage garage.

53.    After Herrington's recantation, Defendants took affirmative steps to convince him to repudiate his recantation, including helping him get his revoked drivers license reinstated. Defendants Parrish and McFatridge intervened on Herrington's behalf with the Office of the Illinois Secretary of State in an attempt to help Herrington get his revoked driver's license restored, despite his five DUI convictions. They successfully restored his driving privileges and even obtained a waiver of fines related to the convictions. Defendants' efforts were not disclosed to Whitlock or his attorneys.

14

54.    Later in 1988, Defendant Rienbolt, while in prison and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

55.    Defendant Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney's office on her behalf.  Neither his intervention nor Rienbolt's statement about Slifer were disclosed to Steidl or Whitlock.

56.    In January of 1989, Defendant Rienbolt recanted her trial testimony.  She told Steidl's appellate lawyer that 1) Steidl "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," 2) that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," 3) that Cheryl Costa "had some involvement with Slifer and the murders," and 4) that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads, but the police and the prosecutor ignored my statements."

57.    Defendants Parrish and McFatridge, upon learning of Defendant Rienbolt's recantations, which among other things implicated them and their fellow Defendants in suborning perjury and obstructing justice, threatened and intimidated Defendant Rienbolt.  As a result of Defendants' threats, she repudiated her recantation.

58.    Whitlock subsequently filed a post-conviction petition which raised, *inter alia*, the testimony of Herrington and Rienbolt and their recantations.

15

59.     In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiff's evidence, discrediting the recantations and again falsely claiming that "one fact will never change --- that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads." Such a statement posed a serious and imminent threat to the fairness of the adjudicative proceedings and constituted an impermissible published opinion on the guilt of Whitlock in violation of Supreme Court Rule 3.6 (Illinois Rules of Professional Conduct).

60.     As a consequence, Herrington's and Rienbolt's original false, manufactured and coerced testimony and their wrongfully induced repudiations of their recantations as aforesaid, the Defendants' continued concealment and suppression of highly exculpatory evidence, Defendants Parrish's and Eckerty's false and perjurious testimony at the hearing, the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign, the trial Judge denied Whitlock's post-conviction petition.

61.     Defendant McFatridge resigned his position as State's Attorney of Edgar County in early 1991.

62.     On September 28, 1988, the Illinois Appellate Court for the Fourth District, basing its decision on the trial court record, containing the same coerced, suggested, fabricated and manipulated evidence and being unaware of the highly exculpatory evidence which had been concealed and suppressed, affirmed Whitlock's conviction and sentence and the denial of his post-conviction petition.

63.     On March 6, 1990, Whitlock filed a petition for habeas corpus in the United States District Court for the Central District of Illinois. As a direct consequence of 1) all of the false testimony, statements and repudiations of recantations which were coerced, suggested,

16

fabricated, manipulated and purchased by Defendants Ray, Parrish, Eckerty and McFatridge, and

2) the Defendants' continued concealment and suppression of highly exculpatory evidence, and

3) Defendant McFatridge's publicity campaign, Whitlock's habeas corpus petition was

ultimately dismissed. On June 8, 1992, Whitlock filed a second petition for habeas corpus in the

United States District Court for the Central District of Illinois which was similarly dismissed as a

consequence of the wrongful conduct of Defendants as aforesaid.

64.    In February 1996, Defendant Rienbolt gave a sworn court reported and

videotaped statement to Steidl's lawyers in which she swore that her prior statements and

testimony were false. She further swore she had not been present at the scene of the murders,

that the knife she provided was not the murder weapon and that she had no knowledge of Steidl

having been involved in the crime. She also averred that Defendants Ray, Parrish, Eckerty and

McFatridge coerced, manipulated and helped her fabricate her statements and trial testimony

which falsely inculpated Steidl and Whitlock.

65.    Less than a week after her 1996 recantation, Defendant Rienbolt met with

Defendants Parrish, Eckerty and McFatridge and, on information and belief, because of their

threats and coercion, retracted her recantation of the previous week.

66.    On September 18, 1997, the Illinois Supreme Court reversed the dismissal of

Steidl's amended post-conviction petition holding that he was entitled to an evidentiary hearing.

Defendants knew that Steidl's success in his hearing would have had a concomitant benefit for

Whitlock.

67.    In 1998, the trial court conducted a post-conviction evidentiary hearing for Steidl.

Defendants again introduced their fabricated evidence and again suppressed exculpatory

material, all in an effort to have the court deny the petition. Defendant McFatridge gave false

and perjured testimony at Steidl's hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants Ray, Parrish, Eckerty and McFatridge continued to conceal and suppress from this hearing all of the exculpatory evidence discussed above. Their wrongful conduct was designed to continue the wrongful incarceration of Steidl, which they knew would have a parallel effect on Whitlock. Their conduct was also designed to cover up Defendants' wrongful acts and omissions in the prosecution, conviction and post-trial proceeding of both Steidl and Whitlock.

68.     On December 11, 1998, the trial court again denied Steidl's post-conviction relief on his conviction, although the court did grant Steidl a new sentencing hearing, at which the state declined to pursue the death penalty. On February 18, 1999, Steidl was resentenced to natural life imprisonment. The Illinois Appellate Court affirmed denial of this post-conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

69.     In 1999, following a national conference, Northwestern University professor David Protess and his Innocence Project sent a team of student investigators from the Center on Wrongful Convictions. The contradictions and anomalies which manifested themselves were also featured in television reports. The disclosures led to the appointment of ISP Lieutenant Michale Callahan ("Callahan") in April 2000 who was assigned to investigate the Steidl and Whitlock convictions.

70.     At the time of his appointment, Callahan was the District 10 Investigations Commander.

71.     Following exhaustive research into the Rhoads' murders and the Steidl and Whitlock trials, Callahan wrote a detailed memo which he sent to ISP Captain John Strohl on May 17, 2000. The memo was circulated up the ISP chain of command to Defendants Carper

18

and Parker and later to Defendant Fermon. Callahan documented a wealth of evidence gathered during his review, all of which supported his conclusion that Steidl and Whitlock "had not been proven guilty beyond a reasonable doubt," and that the Paris businessman "was at one time and should still be the focus of the investigation."

72.     Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Defendant Rienbolt's and Herrington's testimony, including the following:

- Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand about whether she saw Herrington and Steidl together on July 5th;

- Herrington's time line did not fit with the crime;

- A polygraph examiner found purposeful non cooperation of Herrington and the examiner's recommendation that Herrington be re-examined was rejected by the Defendants;

- Rienbolt's testimony that she skipped work on the night of July 5th and was with Steidl and Whitlock was refuted by numerous witnesses;

- Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;

- Rienbolt later recanted her testimony that she was present at the murders and that Steidl was involved;

- Rienbolt lied about the knife;

- Rienbolt admitted that Parrish led her into her false testimony;

- Herrington testified he was at Joe's Bar with Steidl and Whitlock at 8:30 p.m. and they all went to the Horseshoe Bar, while Defendant Rienbolt testified she was with them at the same time at the Tap Room Bar;

- Herrington described the crime scene, placing Dyke Rhoads on the floor with shorts on and Karen Rhoads on the bed with panties on. The firemen said they were totally nude;

- Defendant Rienbolt stated that she went to the American Legion Bar with Barbara Furry. Barbara Furry stated that she has never gone to the bars with Defendant Rienbolt and she was not at the American Legion July 5, 1986;

- Defendant Rienbolt implausibly stated that Steidl and Whitlock took showers at the Rhoads' house after the murders.

- Herrington stated that Whitlock had a clump of Karen Rhoads' hair in his hand. The autopsy report shows no hair torn from Karen Rhoads' head.

73.     In this May 17, 2000, memorandum, Callahan further set forth evidence which supported the determination that the Paris businessman and several of his employees were, and continued to be, suspects in the Rhoads murders, in other related homicides and in organized crime and narcotics trafficking. Callahan found that Defendant Parrish had a connection to the Paris businessman. Callahan found that much of this highly exculpatory evidence was known to Defendants Ray, Parrish, Eckerty and McFatridge and was suppressed from Steidl and Whitlock, including:

- Karen Rhoads was employed by the Paris businessman as a secretary and he frequently visited her apartment;
- The Paris businessman was a suspect in two prior homicides including the murder of a former secretary;
- Karen Rhoads said that she had seen the Paris businessman and an employee load a large sum of cash and a machine gun in the Paris businessman's car;
- Karen Rhoads had told the Paris businessman the Friday prior to the murders that she was quitting her job, that he forbade her from doing so and a big argument ensued. Karen wrote a letter later found on her desk which read "I'm still with Bob. He says my bonus will be real big this year. Believe me it had better;"
- Two of the Paris businessman's employees, who were known as his "right hand men," were implicated in the Rhoads murders;
- The Paris businessman arrived on the scene just as the investigators did and offered his theory about the murders;
- Immediately after the murders, the Paris businessman offered a $25,000 reward in local bars for information on the murders. Herrington later stated that the Paris businessman offered him $25,000 and a job to keep his mouth shut;
- Herrington also told Ray and Parrish that the Paris businessman was at the scene of the murders at the time they occurred;
- Parrish worked for the Paris businessman during a six-month suspension prior to the murders.

74.     Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors. Those memos were also disseminated to Carper and

Parker, and later to Defendant Fermon. In these memos, he provided further details about his interviews which were exculpatory to Steidl and Whitlock. Much of what Callahan reported was known to Defendants Ray, Parrish, Eckerty and McFatridge at all times and was withheld and suppressed from Steidl and Whitlock. These memos, totaling twenty-eight pages of details, containing exculpatory evidence and investigative findings and discussing the connection of the Paris businessman to the Rhoads murders were delivered to Defendants Fermon, Carper and Parker, but not disclosed to Steidl, Whitlock or their attorneys at that time.

75.    Defendant Eckerty, other law enforcement agents and Eckerty's s wife contacted Callahan to tell him that Eckerty was a "good cop" and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost. Callahan suggested a full scale reinvestigation, focusing in large part on the Paris businessman.

76.    Upon receipt of all the evidence and investigative findings reported by Callahan and in an effort to cover up the wrongdoing of Defendants Ray, Parrish, Eckerty and McFatridge, Defendants Fermon, Carper, Brueggemann and Parker refused a full investigation of the Rhoads case because, as Carper put it, it was "too politically sensitive." Defendants Fermon, Carper, Brueggmann and Parker allowed only an investigation of the Paris businessman, limited to intelligence gathering. Then they removed Callahan from the Rhoads case and ordered him to focus on assignments other than the Rhoads murders and the Paris businessman. They demoted Callahan and transferred him from his investigative post and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

77.    Once they obtained full knowledge of the concealed, withheld and suppressed exculpatory evidence which was existing at the time of Whitlock's arrest, conviction and post-conviction proceedings, Defendants Fermon, Carper, Brueggemann and Parker had an

affirmative duty under *Brady* to disclose this evidence to Whitlock and his attorneys. But rather than so advise Whitlock, his attorneys or the courts, Defendants Fermon, Carper, Brueggemann and Parker, along with Defendants Ray, Parrish, Eckerty and McFatridge, kept mum and took steps actively to keep the evidence concealed. Whitlock had a right to be informed about *Brady* material.

78.    As a result of his demotion, Callahan brought a civil suit accusing Fermon and Carper of violating his free speech and of retaliatory demotion. A jury awarded $700,000 in favor of Callahan and against Fermon and Carper.

79.    Because Defendants Fermon, Carper, Brueggemann, Parker and Kaupus suppressed the investigation into the Rhoads murders, the development of further evidence exculpatory to Steidl and Whitlock which would have resulted therefrom was thwarted.

80.    These same Defendants caused the wealth of exculpatory evidence uncovered by Callahan to be withheld from Steidl and Whitlock during the period of time they were petitioning for release. Callahan's information, when combined with the previously concealed information, would have likely resulted in their exoneration and release.

81.    Steidl and Whitlock filed petitions for executive clemency with the Governor of the state of Illinois in which they asked for a pardon on the basis of their innocence.

82.    When he learned of their petitions for clemency, Defendant McFatridge launched a public campaign opposing the freeing of Steidl and Whitlock by pardon, clemency or any collateral relief. In so doing, he again made false public statements which prejudiced Steidl and Whitlock and their legitimate claims of innocence, for a new trial and for release, which they were seeking in post-conviction, habeas and clemency and pardon proceedings.

22

83.    On information and belief, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Steidl and Whitlock if Callahan could represent to him that, based on his investigation, they were innocent.

84.    On information and belief, Callahan, who was required to seek approval from his superiors before providing such an official statement, contacted the Defendants who were his superiors in the chain of command and immediately sought such approval.

85.    On information and belief, Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann and others where he presented all the evidence and findings set forth above and articulated his opinion, supported by all this evidence, that Steidl and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent and that the jury never heard the truth. Callahan also told these Defendants that there was no credible evidence against Steidl and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected that the wrongdoing by Parrish, Eckerty and McFatridge and the Paris businessman should continue to be the focus of the investigation.

86.    At the briefing, Defendants Fermon, Carper and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's representative that Steidl and Whitlock were innocent. On information and belief, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative.

87.    Because of the obstruction and suppression of Callahan's findings and opinions by Defendants Fermon, Carper and Brueggemann, combined with the previous and continuing

suppression of evidence by all Defendants, the Governor declined to make a determination on Steidl and Whitlock's request for clemency and their requests remain pending to this date.

88.     On June 17, 2003, the Federal District Court granted Steidl's petition for writ of habeas corpus, which had been filed on October 5, 2001, vacating Steidl's conviction with a finding that "acquittal was reasonably probable if the jury had heard all of the evidence" and allowing the state 120 days to release or retry him.

89.     Attorney General Lisa Madigan announced she would not appeal the order, stating that after carefully reviewing the evidence, her office found that information favoring the defense was never disclosed, and that Steidl was thus entitled to a new trial.

90.     In a last ditch effort to continue to hold Steidl in custody, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News, in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence and falsely claimed that Steidl was guilty of the brutal murders.

91.     Steidl was released from Danville Correctional Center on May 28, 2004, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew he did not commit.

92.     Despite the fact that the Federal District Court had found that Steidl's trial would have probably resulted in acquittal and despite the fact that Whitlock was convicted on the very same basis, Whitlock was not released.  Despite the fact that the Illinois Attorney General believed that information favoring Steidl's defense was never disclosed and that the same evidence was concealed from Whitlock, all efforts to release Whitlock were strenuously opposed

24

by Defendants. Neither the Illinois Attorney General nor the Office of the State Appellate Prosecutor agreed to afford Whitlock the same treatment as Steidl. Whitlock was forced to continue in his imprisonment for a crime he did not commit.

93.    On June 11, 2004, Whitlock filed a second amended petition for post-conviction relief. Rather than concede that Whitlock was no more culpable than his co-defendant Steidl, who the state refused to retry, the Office of the State Appellate Prosecutor, with the active assistance of Defendants Eckerty and Marlow, vigorously opposed Whitlock's petition and sought his continued incarceration. Defendant Marlow, who also became aware of the wealth of exculpatory evidence, scoured the country trying to get witnesses to testify against Whitlock.

94.    The following was adduced at Whitlock's post-conviction hearing:

- Defendant Eckerty admitted he provided Herrington with alcohol "to help him relax" before his Grand Jury testimony.

- Gary Wheat, a Paris police officer, stated that he stayed with Herrington in Defendant Parrish's cabin and provided Herrington with alcoholic beverages.

- Defendant Eckerty stated that Herrington made an "eavesdropping" telephone call to Whitlock on September 25, 1986, from Parrish's cabin while drinking alcohol they provided.

- Debra Helton, a forensic scientist with the ISP crime laboratory, submitted a stipulated affidavit which stated that she began to screen items of evidence for human blood. Helton was told that Herrington had a cut on his hand and she requested Herrington's blood standard. Defendants Parrish, Eckerty and McFatridge failed and refused to forward Herrington's blood standard to her for testing.

- Dr. John Murphy, the State's pathologist testified that he had removed the sternum from Dyke Rhoads body because he had found a "defect," a knife wound in the sternum. He preserved the sternum in case anyone wished to examine it for tool marks (distinctive to a particular knife blade). No such examination was ever done.

- Dr. Murphy testified that either the Rienbolt knife or the knife found in the sink could have been the murder weapon.

- Donald Tankersky, an arson investigator for the State Fire Marshall, testified that the lamp was in fact not broken until after the fire. The interior was

white and free of soot. Rienbolt had testified she saw broken, a piece in Steidl's hand at the time of the murders

- Whitlock presented Dr. Baden, a forensic pathologist, certified in all three of pathologies sub-specialties. He had performed more than 20,000 forensic autopsies. He concluded to a reasonable degree of medical certainty that the Rienbolt knife did not cause the fatal wound on Dyke Rhoads.

- Dr. Baden also concluded to a reasonable degree of medical certainty that the Rienbolt knife could not have inflicted Karen Rhoads' wound, but that the sink knife could have done so.

95.    Despite the overwhelming evidence at the post-conviction hearing and despite the fact that the state had decided its evidence was insufficient to retry Steidl, Defendant Eckerty, along with Prosecutor David Rands, strenuously opposed Whitlock's petition, submitted the same fabricated, manipulated and false evidence it used to originally convict him and urged the court to deny the petition.

96.    Due in part to 1) the continued reliance on the fabricated, manipulated, coerced and false testimony, on the withholding and suppression of exculpatory evidence, 2) the suppression of the Callahan report and refusal to permit the further investigation, 3) the continued efforts of Defendants to prevent investigation of other credible suspects including the Paris businessman and 4) continued efforts of Defendants not to admit their mistakes, the trial court denied Whitlock's post-conviction petition. Whitlock continued to be incarcerated in the penitentiary despite his innocence.

97.    Whitlock appealed the denial of his petition to the Illinois Appellate Court for the Fourth District. During 2006 and continuing into 2007, the Office of the State Appellate Prosecutor, aided by Defendant Marlow, continued in their attempts to manufacture evidence against Whitlock and defeat his appeal. Defendant Marlow continued to interview potential witnesses strongly suggesting stories to them. On one occasion, he visited Ovid Chambers in Florida and screamed and forcefully told him that he knew Whitlock was with him in the Rhoads

house the night of the murders and that Chambers should so testify. Chambers denied such a story and declined.

98.    Jennifer Aper, a scientist at the ISP crime lab, who has possession of items of physical evidence recovered from the crime scene, was told not to perform mitochondrial DNA tests. Without such tests, the tissue and blood samples cannot be compared to other credible suspects, including those presently incarcerated in other institutions.

99.    On September 6, 2007, the Illinois Appellate Court for the Fourth District issued a 53-page opinion finding *inter alia* that the "State violated *Brady* by suppressing [evidence.]" The Court held, "We find a reasonable probability that but for these errors, considered cumulatively the verdict would have been different." (p. 2) The Court reversed the judgment and conviction and remanded the case back for a new trial.

100.    Despite the Appellate Court's decision, Defendants still objected to Whitlock's release. Whitlock sought to be released on bond so that he could spend Christmas 2007 with his daughter and grandchild, but the state argued against it. Whitlock was finally released on January 8, 2008, when the state *nolle prosequied* the case.

## COUNT I
### (42 U.S.C. § 1983 Claim for Deprivation of Right to Fair Trial, Deprivation of Due Process and for Wrongful Conviction)

101.    Plaintiff realleges paragraphs 1 through 100.

102.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

103.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, prosecution and conviction of Whitlock, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful conviction, by a) coercing, intimidating, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis for Whitlock's charging, prosecution and conviction; b) withholding and concealing from Whitlock's defense attorneys, and the judges, juries, post-trial prosecutors and the Governor and his staff, who were involved in Whitlock's criminal proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus proceedings; e) improperly influencing the judges, juries and executive bodies and officials hearing and considering Whitlock's case, and the post-trial prosecutors who continued his prosecution, *inter alia*, by making false public statements and f) obstructing investigations which would have led to discovery of further exculpatory evidence, and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock of his liberty, violating his right to a fair and

28

impartial trial and violating his rights to due process, all as guaranteed by the Fourteenth Amendment to the United States Constitution.

104.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow in depriving Whitlock of his liberty, his right to a fair trial and his right to due process were a direct and proximate cause of the injuries to Whitlock which are set forth above.

WHEREFORE, Herbert Whitlock demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Charles Brueggemann and Jeff Marlow for substantial compensatory damages in excess of twenty million dollars, and because these Defendants acted maliciously, willfully, wantonly and/or with reckless disregard for Whitlock's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 - Malicious Prosecution)

105.    Plaintiff realleges paragraphs 1 through 100.

106.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents acting under color of state law wrongfully arresting, imprisoning, prosecuting and causing the conviction and sentencing of Whitlock, amounted to malicious prosecution in violation of rights decreed to Whitlock by the Fourth, Fifth and Fourteenth Amendments of the Constitution.  Defendants Steven Fermon, Diane Carper, Charles Brueggemann, Andre Parker, Kenneth Kaupus and Jeff Marlow,

individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents acting under color of state law, caused

the continued incarceration of Whitlock through all of the post-conviction proceedings and

continuing for twenty-one years, without probable cause, egregiously depriving him of his liberty

without due process, and violated Plaintiff's Fourth, Fifth and Fourteenth Amendment rights.

107.    Article 42 U.S.C. § 1983 provides, in pertinent part, as follows:

> "Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress...."

108.    Defendants Ray, Parrish, Eckerty and McFatridge initiated the criminal

proceedings with the aid and assistance of Defendant Rienbolt, Herrington and others.  The

criminal proceedings were ultimately resolved in Whitlock's favor, resulting in his release on

January 8, 2008.  As set forth aforesaid, the initiation of the criminal proceeding was malicious

and without probable cause and, as a consequence, Whitlock suffered a deprivation of his liberty.

109.    The actions of the Defendants as aforesaid were so egregious that they violated

Whitlock's rights to due process and subjected Whitlock to the deprivation of his rights,

privileges and immunities secured by the United States Constitution and laws and were the direct

and proximate cause of Whitlock's injuries and damages.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Defendants Gene

Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre

Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow for compensatory damages in

excess of twenty million dollars, and because these Defendants acted maliciously, willfully,

wantonly, and/or with reckless disregard for Whitlock's Constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (False Imprisonment)

110.    Plaintiff realleges paragraphs 1 through 100.

111.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, false arrest, wrongful prosecution and conviction of Whitlock.

112.    These same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of Whitlock's wrongful conviction and caused him to be continually and falsely imprisoned, by a) coercing, intimidating, constructing and/or fabricating the false statements, testimony and other evidence; b) withholding and concealing from Whitlock and his defense attorneys, from the judges, juries, post-trial prosecutors and from the Governor and his staff, all of who were involved in Whitlock's post-conviction proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; c) suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated Steidl and Whitlock and his co-defendant, including evidence of other more likely suspects; d) writing false reports and giving and tendering false testimony and statements at the Grand Jury, at trial and at post-conviction and habeas corpus

31

proceedings; e) improperly influencing the judges, juries and executive bodies and officials hearing and considering Whitlock's case, and the post-trial prosecutors who continued his prosecution, *inter alia*, by making false public statements; f) obstructing investigations which would have led to discovery of further exculpatory evidence and g) the additional wrongdoing set forth above, thereby unconstitutionally depriving Whitlock of his liberty, causing him to be falsely imprisoned and violating his rights to due process, all as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

113.    The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow in depriving Whitlock of his liberty, his right not to be falsely imprisoned and his right to due process were a direct and proximate cause of the injuries to Whitlock which are set forth above.

WHEREFORE, Herbert Whitlock demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Charles Brueggemann and Jeff Marlow for substantial compensatory damages in excess of twenty million dollars, and because these Defendants acted maliciously, willfully, wantonly and/or with reckless disregard for Whitlock's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim Against City of Paris)

114.    Plaintiff realleges paragraphs 1 through 100.

115.    The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and Jack Eckerty as alleged above, were done pursuant to one or more interrelated *de facto* policies,

practices and/or customs of the Defendant City of Paris, its Police Department and Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting pursuant to, find as an agent of, the city of Paris.

116.    At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office , which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices and customs, which included, *inter alia*:

a.    conducting physically, psychologically or otherwise illegally or improperly coercive and intimidating interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions and convictions;

b.    filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts or all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions and evidence;

c.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or

33

improperly coercive questioning or interrogation of witnesses, suspects, arrestees and other

citizens, including, but not limited to, persons who were physically and/or psychologically

abused during questioning;

    d.  the police code of silence, specifically in cases where officers engaged in

the violations articulated in paragraphs a, b and c above, whereby police officers refused to

report or otherwise covered up instances of police misconduct and/or the fabrication, suppression

and destruction of evidence of which they were aware, despite their obligation under the law and

police regulations to report such violations. Said code of silence also includes police officers

either remaining silent or giving false and misleading information during official investigations

in order to protect themselves or fellow officers from internal discipline, civil liability or

criminal charges, and perjuring themselves in criminal cases where they and their fellow officers

have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or

falsely arrested, imprisoned and prosecuted a criminal defendant; and

    e.  the practice of covering-up wrongdoing by members of the police force

and prosecutors, the suppressing and withholding exonerating, exculpatory and/or other evidence

favorable to criminal defendants which were not turned over to the prosecuting attorneys and/or

defense lawyers.

   117. The patterns and practices set forth above were well known both before and after

Plaintiff was wrongfully arrested, charged, imprisoned and convicted, including by the

commanding and supervisory Defendants named herein, who participated in the cover-up and

suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-

defendant and other victims, *inter alia*, in the manner set forth in this complaint.

34

118.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators and the injuries suffered by the Plaintiff.

119.    The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the city of Paris in police matters, including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Defendant City of Paris for substantial compensatory damages in excess of twenty million dollars, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V
### (State Law Claim for False Imprisonment)

120.    Plaintiff realleges paragraphs 1 through 100.

121.    The imprisonment of Plaintiff, without probable cause, by Defendants Ray, Parrish, Eckerty and McFatridge, individually, jointly and in conspiracy with each other and with

35

certain other named and unnamed private individuals and law enforcement agents; and its

continuation by these Defendants, together with Defendants Fermon, Carper, Parker, Kaupus,

Brueggemann and Marlow, individually, jointly and in conspiracy with each other and with

certain other named and unnamed private individuals and law enforcement agents, constituted

the tort of false arrest and imprisonment under Illinois law.

122.    Defendants' actions in arresting and imprisoning Plaintiff were willful and

wanton.

WHEREFORE, Plaintiff Herbert Whitlock demands compensatory damages in excess of

twenty million dollars against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael

McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow, punitive damages, and such other and additional relief as this

court deems just and equitable.

### COUNT VI
### (State Law Claim for Malicious Prosecution)

123.    Plaintiff realleges paragraphs 1 through 100 and 105 through 109.

124.    Defendants Gene Ray, James Parrish, Jack Eckerty and Michael McFatridge,

individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, initiated a malicious prosecution

without probable cause against Plaintiff, and these same Defendants, together with Defendants

Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff

Marlow, individually, jointly and in conspiracy with each other and with certain other named and

unnamed private individuals and law enforcement agents, continued said prosecution, again

without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The

36

Defendants' actions were done in a willful and wanton manner and directly and proximately caused the injury and damage to Plaintiff as set forth above.

WHEREFORE, Herbert Whitlock demands actual or compensatory damages in excess of twenty million dollars against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

## COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

125. Plaintiff realleges paragraphs 1 through 100.

126. Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray and Michael McFatridge, individually, jointly and in conspiracy, with each other and with Defendant Rienbolt and certain other named and unnamed private individuals and law enforcement agents, engaged in extreme and outrageous conduct by, *inter alia*, constructing, coercing, intimidating, manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by knowingly providing false testimony, by procuring Whitlock's prosecution, conviction and imprisonment for heinous crimes he did not commit, and by making false and defamatory public statements by falsely repudiating recantations and by concealing exculpatory evidence. Additionally, these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, individually, jointly and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in additional extreme and outrageous conduct by suppressing

additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false

imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

127.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge,

Deborah Rienbolt Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow intended, by subjecting Plaintiff to such humiliating, degrading

conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause

Plaintiff and his family severe emotional distress.

128.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was

injured and has experienced, and continues to experience, severe emotional distress, including

fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder,

anxiety, depression and difficulty in focusing or concentrating.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Defendants Gene

Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steven Fermon,

Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow for

compensatory damages in excess of twenty million dollars plus the costs of this action and such

other relief as this Court deems equitable and just.

## COUNT VIII
### (State Claim for Conspiracy)

129.    Plaintiff realleges paragraphs 1 through 100.

130.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge,

Deborah Rienbolt, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles

Brueggemann and Jeff Marlow, with other unsued co-conspirators and other police and

prosecutorial investigative, supervisory and command personnel, together reached an

understanding, engaged in a course of conduct and otherwise jointly acted and/or conspired

among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

131.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above.

132.    Said conspirac(ies) and overt acts were and are continuing in nature and were and are a proximate cause of Plaintiff's tortuous injuries under state law, as set forth above.

133.    Defendants' and their co-conspirators' overt acts, as set forth above; which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff Herbert Whitlock demands compensatory damages in excess of twenty million dollars, jointly and severally, from Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Deborah Rienbolt, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, Charles Brueggemann and Jeff Marlow, and because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT IX
### (State Law Respondeat Superior Claim)

134.    Plaintiff realleges paragraphs 1 through 100.

135.    Defendants Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against the City of Paris for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

### COUNT X
**(745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)**

136.    Plaintiff realleges paragraphs 1 through 100.

137.    Defendant City of Paris was the employer of Defendants Gene Ray and James Parrish at all times relevant and material to this complaint.

138.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Paris.

WHEREFORE, Plaintiff, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendant City of Paris, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

### COUNT XI
**(Edgar County and its State's Attorneys' Office)**

139.    Plaintiff realleges paragraphs 1 through 100.

140.    Defendant Edgar County and its State's Attorneys' Office was the employer of Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar County and its State's Attorneys' Office and who committed the wrongful acts complained of herein within the course and scope of his employment, and said County is therefore responsible for any judgment entered against Defendant McFatridge and is therefore a necessary party hereto.

40

WHEREFORE, Plaintiff Herbert Whitlock demands judgment against Edgar County and

the Edgar County State's Attorneys' Office in the amounts awarded to Plaintiff against

Defendant McFatridge as damages, costs and interest, and for whatever additional relief this

Court deems equitable and just.

**Plaintiff Demands A Jury Trial on all Counts of the Complaint**

Dated:  February 27, 2008                      Respectfully submitted,

                                               HERBERT WHITLOCK

                               By:   _____
                                               One of his attorneys

Ronald H. Balson  rhbalson@michaelbest.com
Carrie A. Hall  cahall@michaelbest.com
Michael Best & Friedrich LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, IL 60601
(312) 222-0800
Fax:  (312) 222-0818

- and -

Richard S. Kling  rkling@kentlaw.edu
Susana Ortiz  sortiz@kentlaw.edu
Law Offices of Richard Kling
565 West Adams Street, 6th Floor
Chicago, IL 60661-3691
(312) 906-5155
Fax:  (312) 906-5299

S:\CLIENT\023996\0001\A2424607.5

✎JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

WHITLOCK, HERBERT

## DEFENDANTS

CITY OF PARIS, ET AL.

(b) County of Residence of First Listed Plaintiff   **Edgar**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **Edgar**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

See attachment.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☒ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. § 1983
Brief description of cause:
Civil rights.

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   In excess of $20,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   02/27/2008

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **HERBERT WHITLOCK,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.** |
| **v.** | ) | |
| | ) | |
| **CITY OF PARIS, Present and Former** | ) | **JURY TRIAL DEMANDED** |
| **Paris Police Officials Chief Gene Ray and** | ) | |
| **Detective James Parrish; former Illinois** | ) | |
| **State Trooper Jack Eckerty; former** | ) | |
| **Edgar County State's Attorney Michael** | ) | |
| **McFatridge; EDGAR COUNTY; and** | ) | |
| **Illinois State Police Officials Steven M.** | ) | |
| **Fermon, Diane Carper, Charles E.** | ) | |
| **Brueggemann, Andre Parker, Kenneth** | ) | |
| **Kaupus and Jeff Marlow; David Rands,** | ) | |
| **Illinois Special Prosecutor, and Deborah** | ) | |
| **Rienbolt,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ATTORNEYS FOR PLAINTIFF

Ronald H. Balson  rhbalson@michaelbest.com
Carrie A. Hall  cahall@michaelbest.com
Michael Best & Friedrich LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, IL 60601
(312) 222-0800
Fax:  (312) 222-0818

- and -

Richard S. Kling  rkling@kentlaw.edu
Susana Ortiz  sortiz@kentlaw.edu
Law Offices of Richard Kling
565 West Adams Street, 6th Floor
Chicago, IL 60661-3691
(312) 906-5155
Fax:  (312) 906-5299

# WESTERN WORLD INSURANCE COMPANY, INC.

### (A stock insurance company, herein called the company)

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the named insured as follows:

## INSURING AGREEMENTS

The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of negligent acts, errors, or omissions of the Insured as follows:

Coverage A — Personal Injury
Coverage B — Bodily Injury
Coverage C — Property Damage

to which this policy applies, and the company shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury or bodily injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

## EXCLUSIONS

This policy does not apply:

(a)  to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation, disability benefits law, or under any similar law, or to personal injury or bodily injury sustained by any full and/or part time law enforcement officer of the named insured directly or indirectly related to his employment by the named insured.

(b)  to damages arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of any insured, or claims or injury arising out of acts of fraud committed by or at the direction of the insured.

(c)  to liability assumed by the insured under any contract or agreement.

(d)  to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
(1) any automobile, aircraft or watercraft owned or operated by or rented or loaned to the named insured, or
(2) any other automobile, aircraft or watercraft operated by any person in the course of his employment by the named insured;

(e)  to bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to the named insured;

(f)  property damage to or loss of
(1) property owned or occupied by or rented to the Insured
(2) property used by the Insured
(3) property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control. This exclusion does not apply to valuables on the person of the inmate;

(g)  to property damage resulting from the acts of a person not insured hereunder and due to an error or omission of an insured;

(h)  to any claim for punitive or exemplary damages whether arising out of acts of insureds, insureds employees or any other person;

(i)  any actions, claims, or suits for Injunctive Relief, including but not limited to, actions, claims or suits brought
(1) to improve the physical conditions on any facility;
(2) to improve the living conditions of any person incarcerated or held in custody;
(3) to ensure the protection or preservation of any person's constitutional rights, nor is there any obligation of the company to provide, or pay for, a defense or investigation of such action, claim, or suit.

## SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limits of liability:

(a)  All expenses incurred by the company, all costs, taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon.

(b)  Premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, but the company shall have no obligation to apply for or furnish any such bonds;

(c)  Reasonable expenses incurred by the insured at the company's request, including actual loss of wages (but not loss of other income) not to exceed $25 per day because of his attendance at hearings or trials at such request.

## DEFINITIONS

"automobile" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto).

"bodily injury" means bodily injury, sickness or disease sustained by any person accidentally caused by any act of the insured in making or attempting to make an arrest, while under arrest, or while resisting an overt attempt to escape by a person under arrest. No act shall be deemed to be or result in bodily injury unless committed in the regular course of duty by the insured.

"damages" includes damages for death and for care and loss of services resulting from bodily injury;

"incident" includes the initial act or acts attributable to a specific alleged crime or complaint resulting in action by the insured, which crime or complaint can be fixed as to time and place and any subsequent acts which directly relate to or arise out of the original crime or complaint.

"insured" means the members of the law enforcement agency named in the declaration, employees of such law enforcement agency and with respect to the activities of the law enforcement agency means the public entity which has administrative control of such agency.

"personal injury" means false arrest, erroneous service of civil papers, false imprisonment, malicious prosecution, libel, slander, defamation of character, violation of property rights, and assault and battery, if committed while making or attempting to make an arrest, while under arrest, or while resisting an overt attempt to escape by a person under arrest. No act shall be deemed to be or result in personal injury unless committed in the regular course of duty by the insured.

"property damage" means physical injury to tangible property sustained or incurred incidental to those activities for which this policy affords coverage under coverages "A" and "B".

## POLICY PERIOD, TERRITORY

This policy applies only to acts committed or alleged to have been committed within the legal jurisdiction of the named insured during the policy period stated in the declarations, including mutual law enforcement agreements between political subdivisions.



PLAINTIFF'S
EXHIBIT

C

## CONDITIONS

**(a) LIMITS OF LIABILITY**

Coverages A and B regardless of the number of (1) **insureds** under this policy, (2) persons or organizations which sustain **damages** payable under this policy, or (3) claims made or suits brought on account of insurance afforded by this policy, the company's liability is limited as follows:

(1) The limit of liability stated in the declarations as applicable to **"each person"** is the limit of the company's liability for all **damages** under Coverages A and B sustained by any one person as the result of any one **incident** but subject to the above provisions respecting **"each person"**, the total limit of the company for all **damages** under Coverages A and B sustained by two or more persons as the result of any one **incident** shall not exceed the limit of liability stated in the declarations as applicable to **"each incident"**.

(2) Subject to the above provision applicable to "each person" or **"each incident"** the total liability of the company for all damages under Coverages A and B shall not exceed the limit of liability stated as **"annual"** in the declarations.

Coverage C

(1) The total liability of the company for all **damages** because of all property damage sustained by one or more persons or organizations as the result of any one incident shall not exceed the limit of property damage liability stated in the schedule as applicable to **"each incident"**.

Subject to the above provision respecting **"each incident"**, the total liability of the company for all **damages** because of all property damage to which this coverage applies shall not exceed the limit of property damage liability stated in the schedule as **"annual aggregate"**.

**(b) INSURED'S DUTIES IN THE EVENT OF INCIDENT, CLAIM OR SUIT**

(1) In the event of an **incident** likely to give rise to a claim hereunder, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof and the names and addresses of the injured and of available witnesses shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable. The **named insured** shall promptly take at its expense all reasonable steps to prevent other claims from arising out of the same or similar conditions, but such expense shall not be recoverable under this policy.

(2) If claim is made or suit is brought against the **insured**, the insured shall immediately forward to the company every demand, notice, summons and other process received by him or his representative.

(3) The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of claims with respect to which insurance is afforded under this policy, and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of incident.

**(c) ACTION AGAINST COMPANY**

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the **insured** to determine the **insured's** liability, nor shall the company be impleaded by the insured or his legal representative. Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the company of any of its obligations hereunder.

**(d) OTHER INSURANCE**

The insurance under this policy shall be excess insurance over any other valid and collectible insurance available to the **insured**, either as an insured under another policy or otherwise.

**(e) SUBROGATION**

In the event of any payment under this policy, the company shall be subrogated to all the **insured's** rights of recovery, therefore, against any person or organization and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **insured** shall do nothing after loss to prejudice such rights.

**(f) CHANGES**

Notice to any agent, or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this policy or estop the company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized agent of the company.

**(g) CANCELLATION**

This policy may be cancelled by the **named insured** by surrender thereof to the company or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the **named insured** at the address shown in this policy, written notice stating when not less than thirty days thereafter such cancellation shall be effective, provided, that if such cancellation is for nonpayment of premium, cancellation may be upon ten days notice. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the **named insured** or by the company shall be equivalent to mailing. If the **named insured** cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premiums is not a condition of cancellation.

**(h) NON-ASSIGNABLE.**

The interest of the **insured** under this policy shall not be assignable.

**(i) TERMS OF POLICY—STATUTE**

Terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statute.

**(j) PREMIUM**

All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium **only** which shall be credited to the amount of earned premium due at the end of the policy period. The final premium shall be based on the average number of all paid law enforcement officers of the **named insured**, full and part time, during the policy period determined as follows:

(1) The **named insured** shall maintain records and report, within thirty days after the end of the policy period, the highest number of paid law enforcement officers specified in the declarations, on any one day for each month this policy was in effect.

(2) The average number of such officers shall be determined by dividing the sum of the number of such officers shown in the monthly reports by the number of monthly reports.

(3) If the earned premium as computed exceeds the advance premium paid, the **named insured** shall pay the excess to the Company, if less, the company shall return to the named insured the unearned portion paid by such insured, subject to the company's retention of the minimum premium.

The company may examine and audit the **named insured's** books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**(k) DECLARATIONS**

By acceptance of this policy, the **named insured** agrees that the statements in the application and declarations are his representations and agreements, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

**In Witness Whereof,** the company has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company.

Secretary                                   President

(Rev. 9/81)

E-FILED
Tuesday, 27 May, 2008 01:56:24 PM
Clerk, U.S. District Court, ILCD

# WESTERN WORLD INSURANCE COMPANY

## LAW ENFORCEMENT LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION II - WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION V - DEFINITIONS.

## SECTION I - COVERAGES

### COVERAGE A   BODILY INJURY AND PROPERTY DAMAGE
### COVERAGE B   PERSONAL INJURY

1. Insuring Agreement
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal injury" to which this insurance applies occurring during the policy period as a result of a "law enforcement incident" that takes place in the coverage territory. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate and settle any claim or "suit" that may result. But:
      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and
      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under COVERAGES A AND B - SUPPLEMENTARY PAYMENTS.
   b. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. Exclusions
   This insurance does not apply to:
   a. "Bodily injury", "property damage", or "personal injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to mutual law enforcement assistance agreements.
   b. Any obligation of the insured under a worker's compensation, disability benefits or unemployment compensation law or any similar law.
   c. "Bodily injury" or "personal injury" to:
      (1) An employee, auxiliary or volunteer law enforcement officer of the insured arising out of and in the course of employment by or service for the insured; or
      (2) The spouse, child, parent, brother or sister of that employee or officer as a consequence of (1) above.

      This exclusion applies:
      (1) Whether the insured may be liable as an employer or in any other capacity; and

      (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.
   d. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
         (a) At or from premises, site or location which is or was at any time owned or occupied by, or rented to or loaned to, any insured;
         (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
         (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible;
         (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
            (i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or
            (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of pollutants.

         Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

         As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.
      (2) Any loss, cost or expense arising out of any:
         (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
         (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.



PLAINTIFF'S
EXHIBIT

D

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

e. "Bodily injury," "property damage" or "personal injury" arising out of the ownership, maintenance, use, or entrustment to others of any aircraft or "auto" owned or operated by or rented or loaned to any insured.

This exclusion also applies:

(1) to the use of any "auto" in any pursuit of another "auto" whether or not such pursuit is conducted in accordance with the departmental regulations of the insured; and

(2) to any claim that the insured has negligently trained, supervised and/or failed to provide proper instruction to its personnel in connection with the use of any "auto" in any pursuit of another "auto."

Use includes operation and "loading" or "unloading."

f. "Property damage" to:

(1) property you own, rent, or occupy;

(2) premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) property loaned to you;

(4) personal property in the care, custody or control of the insured;

This exclusion does not apply to personal property on persons at the time of arrest.

g. Any loss, cost or expense arising out of any actions, claims, "suits" or demands seeking relief or redress in any form other than money damages including but not limited to, actions brought:

(1) to improve the physical conditions of any facility

(2) to improve the living conditions of any person being held in any facility.

However, we will provide a defense for you in any action seeking other than money damages but only if a covered claim or "suit" for "bodily injury", "property damage" or "personal injury" is made within such action.

h. "Personal injury" arising out of oral or written publication of material, done by or at the direction of the insured with knowledge of its falsity.

i. "Bodily injury" or "personal injury" arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the Named Insured.

j. "Bodily injury", "property damage" or "personal injury" arising from police services for anyone other than the Named Insured; however this exclusion does not apply to:

(1) Any insured if the police services were the result of a mutual law enforcement agreement.

(2) The Named Insured, and *only* the Named Insured, for acts of employees while working for others.

(3) Employees of the Named Insured if working for others while in uniform if such work is departmentally approved.

k. "Bodily injury", "property damage" or "personal injury" arising out of the deprivation of rights or violation of:

(1) any civil rights protected under statute 42 U.S.C. §1981, et seq.;

(2) any rights protected by any other federal or state statute; or

(3) any rights protected by the United States Constitution or any state constitution.

l. This insurance does not apply to any claim for punitive exemplary damages.

## COVERAGE C MEDICAL PAYMENTS

1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by a "law enforcement incident":

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The "law enforcement incident" takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the law enforcement incident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid at the time of the "law enforcement incident";

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

We will not pay expense for "bodily injury":

a. To any insured;

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured;

c. To a person injured on that part of premises you own or rent that the person normally occupies;

d. To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law;

e. To a person injured while taking part in athletics.

f. Excluded under Coverages A and B.

g. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## COVERAGES A AND B - SUPPLEMENTARY PAYMENTS

We will pay, with respect to any claim or "suit" we defend:

1. All expenses we incur.

2. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

3. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit" including actual loss of earnings up to $100 per day because of time off from work.

4.  All costs taxed against the insured in the "suit," however, we will not pay any award of attorney's fees, costs, or expenses awarded pursuant to 42 U.S.C. §1988 or any other state or federal statute.
5.  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.
6.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

1.  The organization or entity named in the Declarations.
2.  The members of the law enforcement agency including auxiliary or volunteer law enforcement officers.
3.  Elected or appointed officials but only with respect to acts of the named insured for which they may be held liable.

## SECTION III - LIMITS OF INSURANCE

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
    a.  Insureds;
    b.  Claims made or "suits" brought;
    c.  Persons or organizations making claims or bringing "suits".
2.  The Aggregate Limit is the most we will pay for all damages because of all "bodily injury", "property damage" and "personal injury" to which this insurance applies.
3.  Subject to 2. above, the Law Enforcement Incident Limit is the most we will pay for all damages because of all "bodily injury", "property damage" and "personal injury" arising out of any one "law enforcement incident".
4.  Subject to 2. and 3. above, the Each Person Limit is the most we will pay for all damages because of all "bodily injury", "property damage" and "personal injury" to any one person.
5.  The Aggregate Limit for Medical Payments is the most we will pay for all medical expenses to which this insurance applies.
6.  Subject to 5. above, the Each Person Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

## SECTION IV - LAW ENFORCEMENT LIABILITY CONDITIONS
(See Policy Jacket)

## SECTION V - DEFINITIONS

1.  "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment.
2.  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
3.  "Coverage territory" means the United States of America (including its territories and possessions).

4.  "Loading or unloading" means the handling of property:
    a.  After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";
    b.  While it is in or on an aircraft, watercraft or "auto"; or
    c.  While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;
    but, "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".
5.  "Law enforcement incident" means any negligent act, error or omission in providing police services and any incidental first aid or Emergency Medical Technician services provided as a police officer.
    Any such act, error or omission, together with all related or subsequent acts or omissions with respect to a specific alleged crime or complaint, shall be considered one "law enforcement incident."
    The term "law enforcement incident" shall exclude any and all claims against the insured arising out of the insured's sponsorship, operation, organization, participation and/or association with any athletic, fund raising, entertainment, civic, and/or community activity.
6.  "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:
    a.  False arrest, detention or imprisonment; or
    b.  Malicious prosecution; or
    c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;
    d.  Oral or written publication of material that slanders or liables a person or organization or disparages a person's or organization's goods, products or services; or
    e.  Oral or written publication of material that violates a person's right of privacy; or
    f.  Erroneous service of civil papers;
    g.  Assault and battery;
7.  "Property damage" means:
    a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the "law enforcement incident" that caused it.
    b.  Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "law enforcement incident" that caused it.
8.  "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal injury" to which this insurance applies are alleged. "Suit" includes:
    a.  An arbitration proceeding in which such damages are claimed to which you must submit or do submit with our consent.
    b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

E-FILED
Tuesday, 27 May, 2008  01:56:44 PM
Clerk, U.S. District Court, ILCD

Policy No. MLE  701.760

**LAW ENFORCEMENT LIABILITY INSURANCE**
**DECLARATIONS PAGE**

MLE701753
Renewal of Number

# MONTICELLO INSURANCE COMPANY
## WILMINGTON, DELAWARE

Named Insured and Mailing Address (No., Street, Town or city, County, State, Zip Code)
**CITY OF PARIS**
**103 S. CENTRAL AVENUE**
**PARIS, EDGAR COUNTY, IL  61944**

NOTICE TO POLICYHOLDER: This contract is issued pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.

Policy Period: From **12/27/96**    to **12/27/97**    at 12:01 A.M. Standard Time at your mailing address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE TO PROVIDE INSURANCE AS STATED IN THIS POLICY.

**LIMITS OF LIABILITY**

| | |
|---|---|
| Aggregate Limit | $ 1,000,000.00 |
| Each Occurrence Limit | $ 1,000,000.00 |

**DEDUCTIBLE**

This Policy is subject to a deductible of $ 1,000.00    for each and every occurrence including expenses.

**BUSINESS DESCRIPTION AND LOCATION OF PREMISES**

Location of All Premises You Own, Rent, or Occupy: **SAME**

WMS 99   1  1 0  1997

**PREMIUM**

| | Number of Officers | Rate per Officer | Premium |
|---|---|---|---|
| Class A | 13 | 613.00 | $ 7,969.00 |
| Class B | 1 | 280.00 | 280.00 |
| Class C | 12 | 63.00 | 756.00 |
| Class D | 6 | 127.00 | 762.00 |
| Class E | 1 | 613.00 | 613.00 |

10,380.00 + 311 SURPLUS LINES TAX + 10 COUNTERSIGNATURE FEE + 31 STAMPING + 75 SERVICE FEE = $10,807.00

**FORMS AND ENDORSEMENTS** ( other than applicable Forms and Endorsements shown elsewhere in the policy)

Other forms, endorsements, and state exceptions:
M2310DX (6/94), M2310CP (6/94), PL4150JXM (4/90), M4045 (9/94)

Countersigned:    RLH 12/27/96

By _____
Authorized Representative

M2310 DX(6/94)

PLAINTIFF'S
EXHIBIT
E

# MONTICELLO INSURANCE COMPANY
## A MEMBER COMPANY OF THE JEFFERSON INSURANCE GROUP

This endorsement, effective **12/27/96**          forms a part of Policy No. **MLE701760**
(12:01 A.M., standard time)

issued to   **CITY OF PARIS**

By          **MONTICELLO INSURANCE COMPANY**

## SERVICE OF SUIT ENDORSEMENT - ILLINOIS

It is agreed that the service of process in suit may be made upon

Clausen Miller, P.C.
Attn: James Nolan, Esq.
10 South LaSalle Street, 16th floor
Chicago, IL 60603-1098

and that any suit instituted against any one of them upon this contract, the Company will abide by the final decision of such Court or of an Appellate Court in the event of an appeal.

The above named are authorized and directed to accept service of process on behalf of the Company in any such suit and/or upon the request of the Insured to give a written undertaking to the Insured that they will enter a general appearance upon the Company behalf in the event such a suit shall be instituted.

Further, pursuant to any statute or any state, territory or district of the United States which makes such provision, therefore the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this policy remain unchanged.

_____
AUTHORIZED SIGNATURE

M4045                                                    REV(9/94)



## MONTICELLO INSURANCE COMPANY
### WILMINGTON, DELAWARE

# COMMERCIAL LINES
# POLICY

THIS POLICY CONSISTS OF:

— DECLARATIONS
— COMMON POLICY CONDITIONS
— ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
  • ONE OR MORE COVERAGE FORMS
  • APPLICABLE FORMS AND ENDORSEMENTS

A STOCK COMPANY

PL4150JX 4/90

# POLICE PROFESSIONAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION V-DEFINITIONS.

## SECTION I-COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE

**1. Insuring Agreement.**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B. This insurance applies to "bodily injury" and " property damage" which occurs during the policy period.

The "bodily injury" and "property damage" must be caused by an "occurrence" and arise out of the performance of the insured's law enforcement duties or out of the ownership, maintenance or use of the premises designated in the Declarations (including the ways immediately adjoining such premises on land) and all operations necessary and incidental thereto. The "occurrence" must take place in the "coverage territory." We will have the right and duty to defend any "suit" seeking those damages. But:

(1) The amount we will pay for damages is limited as described in SECTION III—LIMITS OF INSURANCE;

(2) We may investigate and settle any claim or "suit" at our discretion; and

(3) Our right and duty to defend ends when the applicable limit of insurance has been exhausted through the payment of judgments or settlements under Coverages A or B.

**2. Exclusions.**

This insurance does not apply to:

a. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a mutual law enforcement assistance agreement or contract between political subdivisions;

(2) That the insured would have in the absence of the contract or agreement

b. Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law, including acts arising out of class action suits.

c. "Bodily injury" or "property damage" to:

(1) An employee of the insured or an auxiliary or volunteer law enforcement officer arising out of and in the course of employment by the insured, or

(2) The spouse, child, parent, brother of their employee or auxiliary or volunteer law enforcement office, as a consequence of (1) above.

This exclusion applies:

(a) Whether the insured may be held liable as an employer or in any other capacity; and

(b) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

d. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

e. "Property damage" to:

(1) Property you own, rent, or occupy;

(2) Property loaned to you;

(3) Personal property in your care, custody, or control, except property of persons in custody by virtue of arrest or detention: .

f. Claims or "suits" for damages arising out of the willful violation of any federal, state or local statute, ordinance, rule or regulation committed by or with the knowledge or consent of any insured.

M2310CP(6/94)                      1 of 7

g. Claims or "suits" for damages arising out of acts of fraud committed by or at the direction of the insured with affirmative dishonesty or actual intent to deceive or defraud;

h. To claims or "suits" arising out of the performance of any law enforcement activity for anyone other than the Named insured. This exclusion shall not apply if the act or service arises as the result of a mutual law enforcement assistance agreement or contract between political subdivisions, nor does it apply to any departmentally approved activities.

i. Any claims or "suits" seeking relief or redress in any form other than compensatory damages. Nor shall we have any obligation to indemnify the insured for any costs, fees or expenses which the insured shall become obligated to pay as a result of an adverse judgment for injunctive or declaratory relief, however, we will afford defense to the insured for such claims or "suits", if not otherwise excluded, where compensatory damages are sought.

j. "Bodily injury" arising out of any:

 (1) Refusal to employ;

 (2) Termination of employment

 (3) Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions: or

 (4) Consequential "bodily injury" as a result of (1) through (3) above.

 This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages or in any other with or to repay someone else who must pay because of the injury.

k. Any claim or "suit" seeking punitive or exemplary damages. If a suit shall have been brought against the insured for a claim falling within the coverage provided by this policy, seeking both compensatory and punitive or exemplary damages, we will afford a defense to such action, but we shall not have an obligation to pay for any cost, interest, or damages attributed to punitive or exemplary damages.

l. Any claim or "suit" arising out of any communicable disease.

m. Any loss, cost, or expense arising, in whole or part, out of any of the following:

 (1) the actual, alleged or threatened discharge, dispersal, leakage, migration, release or escape of pollutants at any time; or

 (2) any request, demand or order that any insured or others test for monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants: or

 (3) any claim or "suit" by or on behalf of a governmental authority for damages because of testing for monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, adds, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

## COVERAGE B. PERSONAL INJURY LIABILITY.

### 1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" to which this insurance applies. The "personal injury " must be caused by an "occurrence" and arise out of the performance of the insured's law enforcement duties. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS COVERAGES A AND B. We will have the right and duty to defend any "suit" seeking those damages. But

 (1) The amount we will pay for damages is limited as described in SECTION III-LIMITS OF INSURANCE

 (2) We may investigate and settle any claim or "suit" at our discretion; and

 (3) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B.

b. This insurance applies to "personal injury" only if caused by an offense:

 (1) Committed in the "coverage territory" during the policy period; and

 (2) Arising out of the conduct of your law enforcement activities.

**2. Exclusions.**

This insurance does not apply to:

    a. "Personal Injury":

        (1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

        (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

        (3) Arising out of the willful violation of any federal, state or local statute, ordinance, rule or regulation committed by or with the knowledge or consent of any insured;

        (4) Arising out of acts of fraud committed by or at the direction of the insured with affirmative dishonesty or actual intent to deceive or defraud; or

        (5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages

            (a) Assumed in a mutual law enforcement assistance agreement or contract between political subdivisions;

            (b) That the insured would have in the absence of the contract or agreement.

    b. "Personal injury" to:

        (1) An employee of the insured or an auxiliary or volunteer law enforcement officer arising out of and in the course of employment by the insured; or

        (2) The spouse, child, parent brother or sister of that employee, auxiliary or volunteer law enforcement officer, as a consequence of (1) above.

        This exclusion applies:

            (a) Whether the insured may be liable as an employer or in any other capacity; and

            (b) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

c. To claims or "suits" arising out of the performance of any law enforcement activity for anyone other than the Named Insured. This exclusion shall not apply if the act or service arises as the result of a mutual law enforcement assistance agreement or contract between political subdivisions, nor does it apply to any departmentally approved activities.

    d. "Personal injury" arising out of any:

        (1) Refusal to employ;

        (2) Termination of employment

        (3) Coercion, demotion, evaluation, humiliation, reassignment, discipline defamation, harassment, humiliation, discrimination, or other employment related practices, policies, acts or omissions; or

        (4) Consequential "personal injury" as a result of (1) through (3) above.

        This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

e. Any claims or "suits" seeking relief or redress in any form other than compensatory damages. Nor shall we have any obligation to indemnify the insured for any costs, fees or expenses which the insured shall become obligated to pay as a result of an adverse judgment for injunctive or declaratory relief, however, we will afford defense to the insured for such claims or "suits", if not otherwise excluded, where compensatory damages are requested.

f. Any claim or "suit" seeking punitive or exemplary damages. If a suit shall have been brought against the insured for a claim falling within the coverage provided by this policy, seeking both compensatory and punitive or exemplary damages, we will afford a defense to such action, but we shall not have an obligation to pay for any cost, interest, or damages attributed to punitive or exemplary damages.

g. A claim or "suit" arising out of any communicable disease.

**SUPPLEMENTARY PAYMENTS- COVERAGES A AND B**

We will pay, with respect to any claim or "suit" we defend :

1. All expenses we incur.

2. The cost of bonds to release attachments and appeal bonds required in any "suit" we defend, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

3. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work. Expenses as used herein, do not include salaries of officials or employees of the named insured.

4. All costs taxed against the insured in the "suit".

5. All interest on the full amount any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment applicable limit of insurance.

6. Expenses incurred by the insured for first aid to others at the time of an occurrence, for "bodily injury" to which this policy applies.

These payments will not reduce the limits of insurance.

**SECTION II - WHO IS AN INSURED**

1. Each of the following is an insured:

a. The insured named in the Declarations.

b. Your employees, including elected officials, but only for acts within the scope of their employment by you.

c. Volunteers or reserves while performing law enforcement activities for you at your request

However, none of these employees, volunteers or reserves is an insured for:

(1) "Bodily injury" or "personal injury" to you or to a co-employee while in the course of his or her employment; or

(2) "Bodily injury" or "personal injury" arising out of his or her providing or failing to provide professional health care services; or

(3) "Property damage" to property owned or occupied by or rented or loaned to that employee, or any of your other employees.

2. The political subdivision in which you are located is an insured, but only with respect to liability of the political subdivision for which an insured. as defined in paragraph 1 .a, 1.b., or 1.c above, is also liable.

**SECTION III. LIMITS OF INSURANCE**

1. The Limits of insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2.The Annual Aggregate Limit is the most we will pay under Coverage A and Coverage B.

3. Subject to 2. above, the Each Occurrence Limit is the most we will pay for the sum of damages under Coverage A and Coverage B arising out of any one "occurrence."

The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of insurance.

**SECTION IV - CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's successor will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Claim Or Suit.**

a. You must see to it that we are notified promptly of an "occurrence" which may result in a claim. Notice should include:

(1) How, when and where the "occurrence" took place; and

(2) The names and addresses of any injured persons and witnesses.

b. If a claim is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit"

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2) Authorize and/or provide us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because injury or damage to which this insurance may also apply.

d. No insured will, except at their own cost voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us.**

No person or organization has the right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

a. The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of our liability under this policy shall not be reduced by the existence of such other insurance.

When this insurance is excess, we will have no duty under Coverage A to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that such other insurance would pay for the loss in the absence of this insurance and

(2) The total of all deductible and self-insured amounts under all that other insurance.

b. When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, we shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable Method of Sharing provision below:

c. Method of Sharing

(1) If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

(2) If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance for all insurers.

Insurance afforded under Coverage A, for the premises shown on the Declarations page, shall be excess of any other valid and collectible premises liability insurance available to the insured, whether such premises liability is stated to be primary, contributing, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

**5. Premium Audit.**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. The final premium shall be based on the average number of all paid law enforcement officers, of the "named insured", full and part time, during the policy period determined as follows:

1. The "named insured" shall maintain records and report within thirty days after the end of the policy period, the highest number of paid law enforcement officer on any one day in each month for each month this policy was in effect.

2. The average number of such officers shall be determined by dividing the sum of the number of such officers determined above by the number of months the policy was in effect.

Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is written than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree that:

a. The statements in the Declarations and Application for insurance are accurate and complete:

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance any rights or duties specifically assigned in this Coverage Part the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or 'suit' is brought.

**8. Transfer Of Rights Of Recovery To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to Us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. Deductible**

a. Our obligation under Section I Coverage A. and Coverage B. to pay damages on behalf of the insured applies only to the amount of damages in excess of any deductible amount stated in the Declarations.

b. The deductible amount stated in the Declarations, if any, applies to all damages because of "bodily injury," "property damage" and "personal injury" sustained by one person or organization as the result of any one "occurrence"

c. The deductible amount stated in the Declarations applies to each "occurrence" and includes loss payments and adjustment investigative and legal and costs, whether or not loss payment is involved.

d. The terms of this insurance, including those with respect to (1) our right and duty to defend any "suits" seeking damages, and (2) your duties in the event of an "occurrence", claim or "suit" apply irrespective of the application of the deductible amount.

e. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

## SECTION V--DEFINITIONS

1. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment.

2. "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these at any time.

3. "Coverage territory" means:

    a. The United States of America (including its territories and possessions). Puerto Rico and Canada;

4. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or " auto",

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered; but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

5. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which result in "bodily injury", "personal injury" or " property damage" by any person or organization and arising out of the insured's law enforcement duties.

All claims arising out of (a) a riot or insurrection, (b) a civil disturbance resulting in an official proclamation of a state of emergency, (c) a temporary curfew, or (d) martial law are agreed to constitute one "occurrence".

6. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment

    b. Malicious prosecution;

    c. Wrongful entry into, or eviction of a person from, a room, dwellings or premises that the person occupies. or invasion of the right of public occupancy;

    d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods. products or services;

    e. Oral or written publication of material that violates a person's right of privacy;

    f. Assault and battery;

    g. Erroneous service of process;

    h. Violation of property rights;

    i. Discrimination, unless insurance thereof is prohibited by law

    j. Violation of civil rights protected under 42 USC 1981 et seq. or State Law;

    k. Humiliation, mental anguish, or emotional distress, if arising out of the offenses,.a. through j. , listed above; Provided that no offense shall be deemed to be or result in "personal injury" unless committed in the regular course of duty by the insured.

7. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property; or

    b. Loss of use of tangible property that is not physically injured.

8. "Suit" means a civil proceedings in which damages because of "bodily injury", property damage", or "personal injury" to which this insurance applies are alleged. "Suit" includes an arbitration proceedings alleged such damages to which you must submit or submit with our consent.

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. The policy's term can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

In witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative for us.

Secretary                                          President

# RENEWAL CERTIFICATE
## MONTICELLO INSURANCE COMPANY
### WILMINGTON, DELAWARE

ADMINISTRATIVE OFFICE
NEWPORT OFFICE TOWER
525 Washington Blvd.
Jersey City, New Jersey 07310

**RENEWING POLICY NO.** MLE701760

**CERTIFICATE NO.** 1

| YOU AS NAMED INSURED, ADDRESS, ZIP CODE | BROKER / PRODUCER, ADDRESS, ZIP CODE |
|---|---|
| **CITY OF PARIS**<br>**103 S. CENTRAL AVENUE**<br>**PARIS, EDGAR COUNTY, IL 61944** | **CREATIVE OF ILLINOIS**<br>**140 EAST MAIN STREET**<br>**CARMEL, IN 46032** |
| FIRST MORTGAGEE (NAME & ADDRESS) | SECOND MORTGAGEE (NAME & ADDRESS) |
| | |

RENEWAL POLICY PERIOD:

From: **12/27/97** To: **12/27/98** 12:01 A.M. Standard Time at the residence premises.
Inception Expiration

The **residence premises** covered by this policy is located at the above address unless otherwise stated: (No., Street, Apt., Town or City, County, State, Zip Code).

**SAME**

In consideration of the renewal premium stated above, the above numbered policy is renewed for the renewal policy period stated above, subject to all the terms and conditions of the previous policy, except as otherwise specified herein.

[XX] No changes in subject of Insurance, limits of liability, endorsements, terms, or conditions applicable to the previous policy.

[ ] The following changes are applicable to the renewal certificate:
[Endorsements Attached If Applicable]

5 - 1998

MES 99 2

| | | | |
|---|---|---|---|
| RENEWAL PREMIUM: | $ | 10,380.00 | |
| XXXXXXXXXXXXXXXXXXXXX | $ | 311.00 | SURPLUS LINES TAX |
| STAMPING FEE | $ | 31.00 | |
| COUNTERSIGNATURE FEE | $ | 10.00 | |
| SERVICE FEE | $ | 75.00 | |
| | $ | | |
| TOTAL PREMIUM: | $ | 10,807.00 | |

NOTICE TO POLICYHOLDER: This contract is issued pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.

Countersigned: RLH 01/27/98 By: _Thomas L. Dean_

**AUTHORIZED REPRESENTATIVE**

This Renewal Certificate together with the Common Policy Conditions, Common Policy Declarations, Coverage Part Declarations, Coverage Part Coverage Form(s) and Endorsements, if any, issued to form a part thereof, completed the above numbered policy.

M4318 (4/96)                    HOME OFFICE UNDERWRITING / ACCOUNTING

RENEWAL CERTIFICATE

# MONTICELLO INSURANCE COMPANY

WILMINGTON, DELAWARE

ADMINISTRATIVE OFFICE
Newport Office Tower
525 Washington Blvd.
Jersey City, N.J. 07310

RENEWING POLICY NO. ___MLE701760___

CERTIFICATE NO. _2_

| NAMED INSURED MAILING ADDRESS | CITY OF PARIS<br>103 S. CENTRAL AVE.<br>PARIS, EDGAR COUNTY, IL 61944 | CREATIVE UNDERWRITER CORP.<br>140 EAST MAIN STREET<br>CARMEL, IN 46032<br><br>11900 |
|---|---|---|

| RENEWAL POLICY PERIOD: | 1 YEAR | 12/27/98 | 12/27/99 |
|---|---|---|---|
| | TERMS (YEARS) | INCEPTION (MO. DAY YR.) | EXPIRATION (MO. DAY YR.) |

In consideration of the renewal premium stated above, the above numbered policy is renewed for the renewal policy period stated above, subject to all the terms and conditions of the previous policy, except as otherwise specified herein.

[ ] No changes in subject of insurance, limits of liability, endorsements, terms, or conditions applicable to the previous policy.

[X] The following changes are applicable to the renewal certificate:
(Endorsements Attached if Applicable)

CLASS A:  14   RATE PER OFFICER:  563.00
CLASS C:  12   RATE PER OFFICER:   58.00
CLASS D:  6    RATE PER OFFICER:  116.00
CLASS E:  1 (KANINE)  RATE PER DOG:  563.00

WINS

RENEWAL PREMIUM:       $9,837.00

SURPLUS LINES TAX:     $295.00

STAMPING FEE:          $30.00

POLICY FEE:            $85.00

INSPECTION FEE:        $

COUNTERSIGN            $10.00

TOTAL PREMIUM:         $10,257.00

NOTICE TO POLICYHOLDER:This contract is issued pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund

Countersigned: RLH 01/09/99          By: _____

*Thomas L. Dean*
AUTHORIZED REPRESENTATIVE

This Renewal Certificate together with the Common Policy Conditions, Common Policy Declarations, Coverage Part Declarations, Coverage Part Coverage Form(s) and Endorsements, if any, issued to form a part thereof, completed the above numbered policy.

M4318                          COMPANY                          (09/93)

12/17/2007 02:27 PM

E-FILED
Tuesday, 27 May, 2008  01:57:00 PM
Clerk, U.S. District Court, ILCD



# SELECTIVE®
*Insurance*



PLAINTIFF'S
EXHIBIT
F

| Endorsement Number | Policy Number |
|---|---|
| PP0000 | S 1698558 |

## SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA
### 3426 TORINGDON WAY, CHARLOTTE, NC 28277

## POLICY CHANGES

| Named Insured and Address | Policy Period |
|---|---|
| CITY OF PARIS<br>123 S CENTRAL AVE<br>PARIS, IL 61944 | From: DECEMBER 27, 2000<br>To: DECEMBER 27, 2001 |
| | Endorsement Effective Date:<br>DECEMBER 27, 2000 |

| Producer | Producer Number: |
|---|---|
| DIMOND BROTHERS INSURANCE AGENCY INC | 00-12005-00000 |

COVERAGE PART AFFECTED  POLICE PROFESSIONAL COVERAGE PART

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

```
ADD POLICE PROFESSIONAL LIABILITY AS PER ATTACHED.

THE FOLLOWING POLICE PROFESSIONAL FORM(S) AND ENDORSEMENT(S) ARE ADDED:
IL7025A    11/89   COMMERCIAL POLICY INFORMATION PAGE
IL7028     03/94   POLICY CHANGES ENDORSEMENT
IL7068     04/98   IL CHANGES - CANCELLATION AND NONRENEWAL
IN0022     04/98   PUBLIC ENTITY CLAIMS REFERENCE
PD0001     04/98   POLICE PROFESSIONAL LIABILITY COVG FORM
PD0010     04/98   POLICE PROFESSIONAL LIABILITY COVG DEC
PD0200     04/98   LEAD - HAZARDOUS PROPERTIES - EXCLUSION
PD0300     04/98   ASBESTOS - HAZARDOUS PROPERTIES -EXCL
PD0400     04/98   ABUSE AND MOLESTATION - EXCLUSION
PD6000     04/98   EXCL - Y2K COMPUTER RELATED AND OTHER

TOTAL POLICE PROFESSIONAL ADDL/RETURN PREMIUM:    $      8,748.00
```

### Forms and Endorsements:

```
IL 70 25A 1189   COMMERCIAL POLICY INFORMATION PAGE
PD 00 10  0498   POLICE PROFESSIONAL LIABILITY COVG DEC
IL 70 68  0498   IL CHANGES - CANCELLATION AND NONRENEWAL
PD 00 01  0498   POLICE PROFESSIONAL LIABILITY COVG FORM
```
CONTINUED ON SCHEDULE:  IL-7035
NOTICE TO POLICYHOLDER:  All the forms and endorsements contained in this coverage part as of the Endorsement Effective Date are listed above.  Forms and endorsements added to this policy after this date will appear on another Policy Changes endorsement.  Please read your policy and all "Policy Changes" carefully.

| Additional Endorsement Premium |
|---|
| $8,748.00 |
| REG - 1 |
| (This premium may be subject to adjustment.) |

Date Issued:  JULY 16, 2007

Authorized Representative _____

Issuing Office: HEARTLAND REGION

IL-7028 (03/94)

INSURED'S COPY

| Previous Policy Number | Policy Number |
|---|---|
| S   1698558 | S   1698558 |

## POLICE PROFESSIONAL LIABILITY COVERAGE DECLARATIONS

| Policy Effective Date: DECEMBER 27, 2000 | Coverage Effective Date: DECEMBER 27, 2000 |
|---|---|

## S C H E D U L E

1.  Limit of Liability          $1,000,000          Each Person

2.  Limit of Liability          $1,000,000          Each Occurrence

3.  Annual Aggregate Limit   $1,000,000          Each Policy Year

4.  Deductible                      $2,500              Each Claim

| Forms and Endorsements: | Total Advance Premium |
|---|---|
| (Refer to "Commercial Policy Forms and Endorsement Schedule") | $8,748.00 |
| | (This premium may be subject to adjustment.) |

PD 00 10 04 98                     INSURED'S COPY

Policy Number
S  1698558

# COMMERCIAL POLICY FORMS AND ENDORSEMENT SCHEDULE

| Policy Effective Date: | DECEMBER 27, 2000 | Schedule Effective Date: | DECEMBER 27, 2000 |
| --- | --- | --- | --- |

CONTINUATION OF FORMS FOR ENDORSEMENT NUMBER PP0000

```
PD 02 00   0498   LEAD - HAZARDOUS PROPERTIES - EXCLUSION
PD 03 00   0498   ASBESTOS - HAZARDOUS PROPERTIES - EXCL
PD 04 00   0498   ABUSE AND MOLESTATION - EXCLUSION
PD 60 00   0498   EXCL - Y2K COMPUTER RELATED AND OTHER
IN 00 22   0498   PUBLIC ENTITY CLAIMS REFERENCE
```



**NOTICE TO POLICYHOLDER:**   All the forms and endorsements contained in this policy as of the "Schedule Effective Date" are listed above.  Forms and endorsements added to the policy after this date will appear on a "Policy Changes" endorsement.  Please read your policy and all "Policy Changes" carefully.

**NOTE:** All applicable "IL" endorsements  will be attached in the Common Section of the policy.

IL-7035 (08/93)

# POLICE PROFESSIONAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II — WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V — DEFINITIONS.**

## SECTION I — COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS — COVERAGES A AND B.** This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" and "property damage" must be caused by an "occurrence" and arise out of the performance of the insured's law enforcement duties or out of the ownership, maintenance or use of the premises designated in the Declarations (including the ways immediately adjoining such premises on land) and all necessary and incidental operations. The "occurrence" must take place in the "coverage territory." We will have the right and duty to defend any "suit" seeking those damages. But:

      (1) The amount we will pay for damages is limited as described in **SECTION III — LIMITS OF INSURANCE;**

      (2) We may investigate and settle any claim or "suit" at our discretion; and

      (3) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverages A or B.

   b. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

   c. "Property damage" that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the "occurrence" that caused it.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) Assumed in a mutual law enforcement assistance agreement or contract between political subdivisions; or

      (2) That the insured would have in the absence of the contract or agreement.

   b. Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law, including acts arising out of class action suits.

   c. "Bodily injury" or "property damage" to:

      (1) An employee of the insured or an auxiliary or volunteer law enforcement officer arising out of and in the course of employment by the insured; or

      (2) The spouse, child, parent, brother or sister of that employee, auxiliary or volunteer law enforcement officer, as a consequence of **(1)** above.

   This exclusion applies:

      (1) Whether the insured may be liable as an employer or in any other capacity; and

      (2) To any obligation to share damages with or repay someone else who must pay damages because of the "bodily injury" or "property damage".

**PD 00 01 04 98**
**Page 1 of 8**

INSURED'S COPY

d. "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

e. "Property damage" to:

(1) Property you own, rent, or occupy;

(2) Property loaned to you;

(3) Personal property in your care, custody or control, except property of persons in custody by virtue of arrest or detention:

f. Claims or "suits" for damages arising out of the willful violation of any federal, state or local statute, ordinance, rule or regulation committed by or with the knowledge or consent of any insured.

g. Claims or "suits" for damages arising out of acts of fraud committed by or at the direction of the insured with affirmative dishonesty or actual intent to deceive or defraud;

h. To claims or "suits" arising out of the performance of any law enforcement activity for anyone other than the "Named Insured". This exclusion shall not apply if the act or service arises as the result of a mutual law enforcement assistance agreement or contract between political subdivisions, nor does it apply to any departmentally approved activities.

i. Any claims or "suits" seeking relief or redress in any form other than compensatory damages. Nor shall we have any obligation to indemnify the insured for any costs, fees or expenses which the insured shall become obligated to pay as a result of an adverse judgment for injunctive or declaratory relief; however, we will afford defense to the insured for such claims or "suits", if not otherwise excluded, where compensatory damages are requested.

j. Claims or "suits" against the insured for acts of another officer or employee unless said officer or employee is also insured for said acts in a policy of insurance issued by us.

k. "Bodily injury" arising out of any:

(1) Refusal to employ;

(2) Termination of employment;

(3) Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or

(4) Consequential "bodily injury" as a result of (1) through (3) above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

l. Any claim or "suit" seeking punitive or exemplary damages. If a suit shall have been brought against the insured for a claim falling within the coverage provided by this policy, seeking both compensatory and punitive or exemplary damages, we will afford a defense to such action, but we shall not have an obligation to pay for any cost, interest, or damages attributed to punitive or exemplary damages.

m. Any claim or "suit" arising out of the actual or alleged transmission of any communicable disease.

n. Any loss, cost, or expense arising, in whole or part, out of any of the following: (1) the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time; or (2) any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or (3) any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

PD 00 01 04 98
Page 2 of 8

INSURED'S COPY

## COVERAGE B. PERSONAL INJURY LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS — COVERAGES A AND B.** We will have the right and duty to defend any "suit" seeking those damages. But:

      (1) The amount we will pay for damages is limited as described in **SECTION III — LIMITS OF INSURANCE;**

      (2) We may investigate and settle any claim or "suit" at our discretion; and

      (3) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverages A or B.

   b. This insurance applies to "personal injury" only if caused by an offense:

      (1) Committed in the "coverage territory" during the policy period; and

      (2) Arising out of the conduct of your law enforcement activities.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury":

      (1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of any federal, state or local statute, ordinance, rule or regulation committed by or with the knowledge or consent of any insured;

      (4) Arising out of acts of fraud committed by or at the direction of the insured with affirmative dishonesty or actual intent to deceive or defraud; or

      (5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages:

         (a) Assumed in a mutual law enforcement assistance agreement or contract between political subdivisions;

         (b) That the insured would have in the absence of the contract or agreement.

   b. "Personal injury" to:

      (1) An employee of the insured or an auxiliary or volunteer law enforcement officer arising out of and in the course of employment by the insured; or

      (2) The spouse, child, parent, brother or sister of that employee, auxiliary or volunteer law enforcement officer, as a consequence of (1) above.

      This exclusion applies:

      (1) Whether the insured may be liable as an employer or in any other capacity; and

      (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

   c. To claims or "suits" arising out of the performance of any law enforcement activity for anyone other than the "Named Insured". This exclusion shall not apply if the act or service arises as the result of a mutual law enforcement assistance agreement or contract between political subdivisions, nor does it apply to any departmentally approved activities.

   d. "Personal injury" arising out of any:

      (1) Refusal to employ;

      (2) Termination of employment;

      (3) Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies. acts or omissions; or

      (4) Consequential "personal injury" as a result of (1) through (3) above.

**PD 00 01 04 98**
**Page 3 of 8**

INSURED'S COPY

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the "personal injury".

e. Any claims or "suits" seeking relief or redress in any form other than compensatory damages. Nor shall we have any obligation to indemnify the insured for any costs, fees or expenses which the insured shall become obligated to pay as a result of an adverse judgment for injunctive or declaratory relief, however, we will afford defense to the insured for such claims or "suits", if not otherwise excluded, where compensatory damages are requested.

f. Claims or "suits" against an insured for acts of another officer or employee unless said officer or employee is also insured for said acts in a policy of insurance issued by us.

g. Any claim or "suit" seeking punitive or exemplary damages. If a suit shall have been brought against the insured for a claim falling within the coverage provided by this policy, seeking both compensatory and punitive or exemplary damages, we will afford a defense to such action, but we shall not have an obligation to pay for any cost, interest, or damages attributed to punitive or exemplary damages.

h. A claim or "suit" arising out of any communicable disease.

## SUPPLEMENTARY PAYMENTS — COVERAGES A AND B

We will pay, with respect to any claim or "suit" we defend:

1. All expenses we incur.

2. The cost of bonds to release attachments and appeal bonds required in any "suit" we defend, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

3. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work. Such expenses, do not include salaries of officials or employees of the named insured.

4. All costs taxed against the insured in the "suit."

5. Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

6. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

7. Expenses incurred by the insured for first aid to others at the time of an "occurrence", for "bodily injury" to which this policy applies.

These payments will not reduce the Limits of Insurance.

## SECTION II — WHO IS AN INSURED

1. Each of the following is an insured:

    a. The insured named in the Declarations.

    b. Your employees, but only for acts within the scope of their employment by you.

    c. Volunteers or reserves while performing law enforcement activities for you at your request.

    However, none of these employees, volunteers or reserves is an insured for:

    (1) "Bodily injury" or "personal injury" to you or to a co-employee while in the course of his or her employment; or

    (2) "Bodily injury" or "personal injury" arising out of his or her providing or failing to provide professional health care services; or

    (3) "Property damage" to property owned or occupied by or rented or loaned to that employee, volunteer or reserve or any of your other employees, volunteers or reserves.

2. The political subdivision in which you are located is an insured, but only with respect to liability of the political subdivision for which an insured, as defined in paragraph **1.a.**, **1.b.**, or **1.c.** above, is also liable.

## SECTION III — LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    a. Insureds;

**PD 00 01 04 98**
**Page 4 of 8**

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits."

2. The Annual Aggregate Limit is the most we will pay for the sum of damages under Coverage A and Coverage B.

3. Subject to **2.** above, the Each Occurrence Limit is the most we will pay for the sum of damages under Coverage A and Coverage B because of all "bodily injury", "property damage" and "personal injury" arising out of any one "occurrence."

4. Subject to **3.** above, the Each Person Limit is the most we will pay under Coverage A and Coverage B because of all "bodily injury", "property damage" and "personal injury" to any one person.

The limits of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV — POLICE PROFESSIONAL LIABILITY CONDITIONS

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or of the insured's successor will not relieve us of our obligations under this policy.

2. **Duties In The Event Of "Occurrence", Claim Or "Suit".**

   a. You must see to it that we are notified promptly of an "occurrence" which may result in a claim. Notice should include:

      (1) How, when and where the "occurrence" took place; and

      (2) The names and addresses of any injured persons and witnesses.

   b. If a claim is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit."

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us.**

   No person or organization has a right under this policy:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us under this policy unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance.**

   a. The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance.   When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of our liability under this policy shall not be reduced by the existence of such other insurance.

      When this insurance is excess, we will have no duty under Coverage A to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**PD 00 01 04 98**
**Page 5 of 8**

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all such other insurance.

**b.** When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, we shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable Method of Sharing provision below:

**c.** Method of Sharing

**(1)** If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this method each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the loss remains, whichever comes first.

**(2)** If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable Limits of Insurance of all insurers.

The insurance afforded by this policy for the ownership, maintenance or use of the premises designated in the Declarations (including the ways immediately adjoining such premises on land) and all necessary and incidental operations thereto shall be in excess of any other valid and collectible premises liability insurance available to the insured, whether such premises liability is stated to be primary, contributing, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

**5. Premium Audit.**

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. The final premium shall be based on the average number of all paid law enforcement officers of the Named Insured, full and part time, during the policy period determined as follows:

**1.** The Named Insured shall maintain records and report, within thirty days after the end of the policy period, the highest number of paid law enforcement officers on any one day in each month for each month this policy was in effect.

**2.** The average number of such officers shall be determined by dividing the sum of the number of such officers determined above by the number of months the policy was in effect.

Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree that:

**a.** The application for insurance completed in solicitation of this insurance is made a part of this policy as though set forth in full herein;

**b.** The statements in the Declarations and Application for insurance are accurate and complete;

**c.** Those statements are based upon representations you made to us; and

**d.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**PD 00 01 04 98**
**Page 6 of 8**

INSURED'S COPY

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. Deductible.**

a. Our obligation under Section I Coverage A. and Coverage B. to pay damages on behalf of the insured applies only to the amount of damages in excess of any deductible amount stated in the Declarations.

b. The deductible amount stated in the Declarations, if any, applies to all damages because of "bodily injury," "property damage" and "personal injury" sustained by one person or organization as the result of any one "occurrence."

c. The deductible amount stated in the Declarations applies to each "occurrence" and includes loss payments and adjustment, investigative and legal fees and costs, whether or not loss payment is involved.

d. The terms of this insurance, including those with respect to (1) our right and duty to defend any "suits" seeking damages, and (2) your duties in the event of an "occurrence," claim or "suit" apply irrespective of the application of the deductible amount.

e. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**SECTION V — DEFINITIONS**

**1.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

**2.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**3.** "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

c. All parts of the world if:

(1) The injury or damage arises out of the activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your law enforcement activities; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**4.** "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto;"

b. While it is in or on an aircraft, watercraft or "auto;" or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**5.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;



INSURED'S COPY

d.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

e.  Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **(2)** Cherry pickers and similar devices used to raise or lower workers;

f.  Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

   **(1)** Equipment designed primarily for:

      **(a)** Snow removal;

      **(b)** Road maintenance, but not construction or resurfacing;

      **(c)** Street cleaning;

   **(2)** Cherry pickers and similar devices mounted on automobile truck chassis and used to raise or lower workers; and

   **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

6.  "Occurrence" means an event, including continuous or repeated exposure to substantially the same general harmful conditions, which results in "bodily injury", "personal injury", or "property damage" by any person or organization and arising out of the insured's law enforcement duties.

All claims arising out of (a) a riot or insurrection, (b) a civil disturbance resulting in an official proclamation of a state of emergency, (c) a temporary curfew, or (d) martial law are agreed to constitute one "occurrence".

7.  "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

   a.  False arrest, detention or imprisonment;

   b.  Malicious prosecution;

   c.  Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies, invasion of the right of private occupancy, or denial of public occupancy;

   d.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e.  Oral or written publication of material that violates a person's right of privacy;

   f.  Assault and battery;

   g.  Erroneous service of process;

   h.  Violation of property rights;

   i.  Discrimination, unless insurance thereof is prohibited by law;

   j.  Humiliation or mental anguish;

   k.  Violation of civil rights protected under 42 USC 1981 et seq. or State Law;

   provided that no offense shall be deemed to be or result in "personal injury" unless committed in the regular course of duty by the insured.

8.  "Property damage" means:

   a.  Physical injury to tangible property, including all resulting loss of use of that property; or

   b.  Loss of use of tangible property that is not physically injured.

9.  "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," or "personal injury" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding or any other alternative dispute resolution proceeding alleging such damages to which you must submit or submit with our consent.

**PD 00 01 04 98**
**Page 8 of 8**

INSURED'S COPY

## LEAD-HAZARDOUS PROPERTIES — EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

POLICE PROFESSIONAL LIABILITY COVERAGE FORM

The Company shall not make any payment nor defend any suit in connection with any CLAIMS made against the INSURED:

1. For any damages arising out of, resulting from, caused by or contributed to by the toxic or pathological properties of lead, lead compounds or lead contained in any materials;

2. For any cost or expense to abate, mitigate, remove or dispose of lead, lead compounds or materials containing lead;

3. For any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with parts **(1)** or **(2)** above; or

4. For any obligation to share damages with or repay someone else who must pay damages in connection with parts **(1), (2)** or **(3)** above.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions or limitations of the policy to which this endorsement is attached other than as above stated.

**PD 02 00 04 98**

INSURED'S COPY

# ASBESTOS — HAZARDOUS PROPERTIES — EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

POLICE PROFESSIONAL LIABILITY COVERAGE FORM

The following exclusion is added to **SECTION 1 — EXCLUSIONS:**

The Company shall not make any payment nor defend any suit in connection with any CLAIMS made against any INSURED:

For any loss, cost or expense arising out of, resulting from, caused or contributed to by asbestos or exposure to asbestos.  This includes, but is not limited to, any costs for abatement, mitigation, removal or disposal of asbestos.

This exclusion also includes, but is not limited to:

1.  Any supervision, instructions, recommendations, request, warnings or advice given to which should have been given in connection with the above; and

2.  Any obligation to share damages with or repay someone else who must pay damages.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions or limitations of the policy to which this endorsement is attached other than as above stated.

**PD 03 00 04 98**

INSURED'S COPY

# ABUSE OR MOLESTATION — EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

POLICE PROFESSIONAL LIABILITY COVERAGE FORM

The Company shall not make any payment nor defend any suit in connection with any CLAIMS made against the INSURED:

1. Arising out of the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any INSURED; or

2. Arising out of the negligent:

   a. employment;

   b. investigation;

   c. supervision;

   d. reporting to the proper authorities, or failure to so report; and/or

   e. retention

of a person for whom any INSURED is or ever was legally responsible (including but not limited to all persons who were, now are or shall be employed by the INSURED) and whose conduct would be excluded by **1.** above.

**PD 04 00 04 98**

INSURED'S COPY

# EXCLUSION — YEAR 2000 COMPUTER-RELATED
# AND OTHER ELECTRONIC PROBLEMS

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

    POLICE PROFESSIONAL LIABILITY COVERAGE FORM

The following is added to **SECTION I. COVERAGE A. AND COVERAGE B., ITEM 2. Exclusions** of the **POLICE PROFESSIONAL LIABILITY OCCURRENCE COVERAGE** form:

This insurance does not apply to any claim or **SUIT** in connection with any loss:

**1.** Arising directly or indirectly out of:

    **(a)** Any actual or alleged failure, malfunction or inadequacy of:

        **(1)** Any of the following, whether belonging to an Insured or to others:

            **i.** Computer hardware, including microprocessors;

            **ii.** Computer application software;

            **iii.** Computer operating systems and related software;

            **iv.** Computer networks;

            **v.** Microprocessors (computer chips) not part of any computer system; or

            **vi.** Any other computerized or electronic equipment or components; or

        **(2)** Any other products, and any services, data or functions that directly or indirectly use to rely upon, in any manner, any of the items listed in paragraph 1(a)(1) of this endorsement due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 or beyond.

    **(b)** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in paragraph 1.(a) of this endorsement.



**PD 60 00 04 98**

INSURED'S COPY

## CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**
Western World Insurance Group

**DEFENDANTS**
Selective Insurance Company of South Carolina and Monticello Insurance Company n/k/a Allianz Global Risk U.C.

**(b)** County of Residence of First Listed Plaintiff  Cheshire County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Mecklenberg County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Johnson & Bell, Ltd.
33 W. Monroe Street, Suite 2700
Chicago, IL 60603

Attorneys (If Known)

**FILED**

**MAY 27 2008**

08-2118

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [X] 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [X] 2 | Incorporated and Principal Place of Business In Another State | [X] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [X] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury— | of Property 21 USC 881 | | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | Liability | [ ] 660 Occupational | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| Student Loans (excl. vet.) | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | [ ] 490 Cable/Satellite TV |
| [ ] 153 Recovery of Overpayment | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 810 Selective Service |
| of Veteran's Benefits | Liability | [ ] 371 Truth in Lending | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 850 Security/Commodity/Exch. |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | [ ] 710 Fair Labor Standards | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle | Property Damage | Act | [ ] 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| [ ] 195 Contract Product Liability | Product Liability | [ ] 385 Property Damage | [ ] 720 Labor/Mgmt. Relations | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 196 Franchise | [ ] 360 Other Personal Inj. | Product Liability | [ ] 730 Labor/Mgmt.Reporting | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | **FEDERAL TAX SUITS** | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | [ ] 740 Railway Labor Act | [ ] 870 Taxes (U.S. Plaintiff | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | Sentence | [ ] 790 Other Labor Litigation | or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | Habeas Corpus: | [ ] 791 Empl. Ret. Inc. | [ ] 871 IRS—Third Party | [ ] 900 Appeal of Fee |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | Security Act | 26 USC 7609 | Determination Under |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | | | Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 445 ADA—Employment | [ ] 540 Mandamus & Other | | | [ ] 950 Constitutionality of |
| | [ ] 446 ADA — Other | [ ] 550 Civil Rights | | | State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | | | [ ] 890 Other Statutory Actions |

### V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

28 U.S.C. 2201
Declaratory Judgment Action regarding primary/excess

### VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

### VIII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [X] No

**IX. This case**
[X] is not a refiling of a previously dismissed action.
[ ] is a refiling of case number _____ , previously dismissed by Judge _____

DATE  May 22, 2008

SIGNATURE OF ATTORNEY OF RECORD